QUARRY KNOLL II CORPORATION ET AL. *v.*
PLANNING AND ZONING COMMISSION OF
THE TOWN OF GREENWICH ET AL.
(SC 16378)
(SC 16379)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

676

Argued February 13—officially released July 17, 2001

*Haden P. Gerrish*, for the appellant in Docket No. SC 16378 (named defendant).

*Michael J. Cacace*, with whom were *Ronald E. Kowalski II* and, on the brief, *David J. Coviello*, for the appellants in Docket No. SC 16379 (defendant Mark G. Metcalf et al.).

*James R. Fogarty*, with whom was *Carolyn A. Collins*, for the appellee in both cases (substitute plaintiff).

*Timothy S. Hollister* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

*Opinion*

KATZ, J. These separate appeals arise out of the decision of the named defendant, the planning and zoning commission of the town of Greenwich (commission), to deny two related applications of the original plaintiffs in this action, Quarry Knoll II Corporation (Knoll) and Quarry Ridge Greenwich, LLC (Ridge), for the construction of an affordable housing development in Greenwich.[1] The remaining defendants, Mark G. Metcalf, Steven Glasser, Michael B. Tom, Harold Schroeder, Creighton Condon, Albert G. Preston, Jr., Dorothy Preston and the Milbrook Owners Association, Inc. (individual defendants), had intervened in the administrative proceedings before the commission to raise environmental issues pursuant to General Statutes § 22a-19.[2]

[1] During the pendency of this appeal, Greyrock of Greenwich LLC (Greyrock), was substituted for Ridge and Knoll as the party plaintiff. For simplicity, Ridge and Knoll will be referred to as "the plaintiffs" and Greyrock will be referred to by name.

[2] General Statutes § 22a-19 provides: "Administrative proceedings. (a) In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state.

"(b) In any administrative, licensing or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and

The plaintiffs appealed from the denial of each application to the Superior Court, pursuant to General Statutes (Rev. to 1997) § 8-30g (b),[3] naming the commission and

no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare."

[3] General Statutes (Rev. to 1997) § 8-30g provides in relevant part: "Affordable housing land use appeals procedure. (a) As used in this section: (1) 'Affordable housing development' means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty-five per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income or eighty per cent of the state median income, whichever is less, for at least thirty years after the initial occupation of the proposed development; (2) 'affordable housing application' means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing; (3) 'assisted housing' means housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code; (4) 'commission' means a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority; and (5) 'municipality' means any town, city or borough, whether consolidated or unconsolidated.

"(b) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, specified in subparagraph (B) of subdivision (1) of subsection (a) of this section, contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section. Such appeal shall be filed within the time period for filing appeals as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, and shall be made returnable to the superior court for the judicial district where the real property which is the subject of the application is located. Affordable housing appeals shall be heard by a judge assigned by the Chief Court Administrator to hear such appeals. To the extent practicable, efforts shall be made to assign such cases to a small number of judges so that a consistent body of expertise can be developed. Appeals taken pursuant to this subsection shall be privileged cases to be heard by the court as soon after the

Metcalf as defendants in the first appeal, and the com-

return day as is practicable. Except as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable.

"(c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) (A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; and (D) such public interests cannot be protected by reasonable changes to the affordable housing development or (2) (A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.

"(d) Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. The commission may hold a public hearing and shall render a decision on the proposed modification within forty-five days of the receipt of such proposed modification. The commission shall issue notice of its decision as provided by law. Failure of the commission to render a decision within said forty-five days shall constitute a rejection of the proposed modification. Within the time period for filing an appeal on the proposed modification as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, the applicant may appeal the commission's decision on the original application and the proposed modification in the manner set forth in this section. Nothing in this subsection shall be construed to limit the right of an applicant to appeal the original decision of the commission in the manner set forth in this section without submitting a proposed modification or to limit the issues which may be raised in any appeal under this section.

"(e) Nothing in this section shall be deemed to preclude any right of

mission and the individual defendants in the second appeal. The two actions subsequently were consolidated by the trial court, *McWeeny, J.* Thereafter, the trial court, *Axelrod, J.*, after a hearing, rendered judgment sustaining the plaintiffs' appeals and ordering the commission to grant all approvals sought by the plaintiffs. From that judgment, on the granting of certification, both the commission and the individual defendants appealed separately to the Appellate Court. Subsequently, pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c), we granted the plaintiffs' motion to transfer both appeals to this court and granted the motion of Greyrock to be substituted for Knoll and Ridge as the plaintiff.

The record discloses the following facts and procedural history. At the commencement of this action in the trial court, the plaintiffs were Ridge, a for-profit developer and record owner at that time of the property in issue, and Knoll, a nonprofit entity controlled by the housing authority of the town of Greenwich, and the contract purchaser of the 2.39 acre parcel intended as the site of the housing development (property). On February 5, 1998, the plaintiffs filed, as coapplicants, an application with the commission for approval to construct on the property a ninety-two unit senior housing complex to be known as "Quarry Ridge."[4] They requested the following approvals for the property from the commission: (1) preliminary site plan and special permit approval, pursuant to the building zone regulations of Greenwich; (2) a zone change for the site from the existing R-6 single/multiple-family zone to the R-

appeal under the provisions of sections 8-8, 8-9, 8-28, 8-30, or 8-30a. . . ."

Since 1998, the time of the administrative proceedings in this case, § 8-30g was amended several times, most recently in 2000. See Public Acts 2000, 00-206, § 1 (g); see also footnote 14 of this opinion and the accompanying text for our discussion of the effect of that amendment.

[4] The contract of sale was expressly contingent upon Ridge obtaining approval from the commission for the construction of the housing complex.

PHD-E residential-planned housing development-elderly zone; and (3) municipal improvement approval to permit the Greenwich housing authority, through Knoll, to purchase the property for purposes of locating and operating the development. The application, designed to meet the affordability requirements of § 8-30g; see footnote 3 of this opinion; for an "affordable housing development," sought approval for ninety-two, one bedroom affordable elderly housing units in a four-story building on the property.

On March 31, 1998, and April 21, 1998, the commission conducted public hearings on the application, during which Metcalf, a neighboring property owner, intervened pursuant to § 22a-19; see footnote 2 of this opinion; alleging environmental problems associated with the proposed development. Thereafter, on May 12, 1998, the commission adopted a resolution deferring any action on the municipal improvement proposal until receipt of a report from the inland wetlands and watercourses agency. On June 30, 1998, the commission denied the application, including all three of the approval requests. Notice of the denial was published in the Greenwich Time newspaper on July 7, 1998. The reasons for the commission's denial were contained in a letter to Knoll and Ridge, dated July 15, 1998.[5]

---

[5] In its letter to the plaintiffs, the commission offered reasons for its denial of the application. The letter provided in relevant part: "WHEREAS, applicant proposes to construct a 77,000 sq. ft. building with a footprint of 305 ft. x 65 ft., four stories high, with 92 one-bedroom apartments for independent elderly residents and 42 parking spaces, but only 40% of these units will qualify as affordable under [General Statutes §] 8-30g, and the remainder will be moderate income units, on the 2.39-acre site, which is zoned R-6 and permits 24 dwelling units (10/acre). The proposed re-zoning to [R-PHD-E] would allow the 92-unit apartment building at a density of 38 units/acre. The site adjoins another [PHD-E] development by the Housing Authority, Quarry Knoll II, having 40 dwelling units at a density of 25 units/acre; Also in the complex is Quarry Knoll I, zoned R-6 and providing 50 units for the independent elderly; and further, the Commission finds that the adjoining residents have relied on the R-6 zoning for many years and did not expect such a drastic change from the 24 permitted units to the 92 units on 2 acres and its potential impacts upon property values, and

"WHEREAS, the Commission recognizes that the [t]own must meet the need for affordable housing for the town's existing elderly residents, (an objective of the 1998 Town Plan of Conservation and Development), submitted by Housing Authority indicates that these units would be open to non-residents and therefore there is a reasonable doubt that the existing local need may not be as great as 92 units requested or warrant . . . and there is no guarantee that only present Greenwich elderly residents will be served; and

"WHEREAS, the Commission notes that the application to rezone the property to [R-PHD-E] was submitted on behalf of co-applicants—[Knoll], a non-profit sponsor affiliated with the Housing Authority of the Town of Greenwich, and [Ridge], a private for profit developer not representing itself as a non-profit sponsor, and Sec. 6-42 of the Building Zone Regulations requires that the application for a [R-PHD-E] zone be made by the Housing Authority or a non-profit sponsor. Therefore, the Commission finds that the private developer does not and can not qualify as an applicant or co-applicant under the provision of the [R-PHD-E] zone and the request for rezoning is not supportable; and therefore the joint application does not meet the standards of Sec. 6-42 (a) of the Building Zone Regulations and

"WHEREAS, the Commission notes that the site is environmentally difficult and sensitive with bedrock outcrops, varying slopes with some as steep as 37%, a wetland area/drainage corridor, and a stormwater runoff drainage problem which regularly leaves areas to the east (Overlook Drive) burdened with standing water and flooding problems. The increase in impervious surface (by replacing a small house and out buildings with a massive, institutional structure and associated parking and accessway) requires a state of the art drainage system to avoid exacerbating flooding problems. Given the severe problems in the area there is concern that a system that appears conceptually acceptable not function as effectively as expected and problems will worsen, and therefore the plan does not address these concerns beyond a reasonable doubt and therefore does not meet the standards of Sec. 6-17 (d) (3) of the [building zone regulations]. A large amount of blasting/rock cutting will be required to construct a parking area—issues of safety for Le Grande Avenue residents whose homes back up to the site and these issues must be resolved.

"WHEREAS, the Commission notes that the staff of the Inland Wetlands Agency in a memo dated 6/26/98 has expressed concern that existing ground water may have been contaminated and this contaminated ground water may flow off site into the downstream properties and out into Long Island Sound, and this issue must be addressed by the CT Department of Environmental Protection or the Greenwich Health Department, and was raised in the verified pleading filed pursuant to Sec. 22a-19 therefore a positive finding cannot be made that the plan meets the standards of Sec. 6-17 (d) (6), and the Commission cannot make positive findings per Sec. 22a-19 on this plan,

"WHEREAS, the Town's Conservation Director in a letter dated 4/17/98 notes that the site was contaminated with lead and arsenic. While affected oils may have been removed from the site, the question of soil structure

## On July 22, 1998, the plaintiffs filed an appeal in the Superior Court, challenging the denial of the application

stability which can be compromised when ash mixes with soil has not been addressed. The Conservation Director suggests the need for geotechnical analysis by a soils engineer to determine if soils can support proposed structures, particularly the berm for a drainage basin and the parking lot, and therefore the Commission cannot make a positive finding per sec. 6-17 (d) (6), and

"WHEREAS, the Commission has received a verified pleading pursuant to Sec. 22a-19 of the Connecticut General Statutes alleging unreasonable pollution, impairment or destruction of trees and other natural resources and the Commission should consider alternatives to this proposal in order to make findings that there is a more reasonable, prudent alternative that would have less impact on natural resources. The Commission finds the applicant's presentation and application materials did not provide alternatives to the proposed submitted plan which the applicant stated had been explored and abandoned. An examination of these alternatives is a requirement placed on the Commission by the filing of the [§] 22a-19 pleading; and the Commission cannot make positive findings at this time and the verified pleading raises questions and unresolved issues of substantial alterations of the wetlands which could be mitigated by other types of developments and alternatives; and further, the Commission finds that the significant increase in site coverage, excavation and tree removal could potentially create an adverse impact upon adjoining residential properties and therefore the plan does not meet the standards of Sec. 6-17 (d) (11) (6) and

"WHEREAS, the Commission finds that the proposal, if approved, would add to a large concentration of subsidized housing (sponsored by the Housing Authority) in one area of Town—Agnes Morely Heights, Wilbur Peck Court, Town Hall Annex and Quarry Knoll I and II. The Commission has concerns about the long-range planning impacts of such concentration; and that proper long-range planning demands avoiding concentrations of public[ly] supported housing in one area and the location of such housing be spread thru various parts of town, and therefore the plan does not meet the standards of Sec. 6-17 (d) (12), and

"WHEREAS, the Commission finds that the proposed height, bulk and scale of this building presents a mass that far exceeds the scale of housing in adjoining R-6 and R-12 zoned neighborhoods and therefore does not meet the standards of Sec. 6-17 (d) (9) (11) and 6-15; and further . . . the Commission recommends that the proposal be more in keeping with the scale and bulk of the existing neighborhood, perhaps in two or more buildings, and more in keeping with the scale of adjacent Housing Authority housing at Quarry Knoll I and II, both designed at a smaller, more user-friendly scale with several buildings of attached and detached housing;

"WHEREAS, the Commission received no revised site plan for Quarry Knoll I and II and is unable to determine whether there is an unsafe or unacceptable potential traffic increase on Quarry Knoll Drive for the elderly

residents, pedestrians and drivers. The commission finds that a revised site plan is needed because access to Quarry Ridge is proposed to be thru Quarry Knoll whose traffic circulation patterns may be changed and a loss of parking spaces may occur on the Quarry Knoll site due to the new cut thru driveway access, and therefore the plan does not meet the standards of Sec. 6-17 (d) (11) and 6-15 (a) (2), (e), (g), and

"The Commission notes that the current parking and circulation system was designed years ago to serve the 90 dwelling units in Quarry Knoll I and II developments. The Quarry Ridge building with 92 units was initially intended to address the site from LeGrande Avenue which was quickly seen as not sufficient or adequate to handle the access and traffic impact in that location for the proposal; there is also a question of the need for a Municipal Improvement approval for the Housing Authority deed stipulation and granting of an access easement over its Quarry Knoll property to [Ridge], a for profit corporation and co-applicant on town owned property,

"WHEREAS, the Commission notes this is not the first proposal for development of 59 Le Grande Avenue that has been found unacceptable. Years ago the [Planning and Zoning] Board of Appeals rejected a proposal for a convalescent nursing home because of its size and expected traffic considered unsafe for Le Grande Avenue area with its narrow streets. Ultimately the Board approved a smaller structure—a 22,000 sq. ft., 2 1/2 story building with a footprint 200 feet by 45 feet. The building was never constructed.

"WHEREAS, the Commission finds after studying the plans and the site that there is insufficient outdoor recreation space, suitably graded, for the independent elderly who will live on the site and need walking and seating areas on the grounds of their home in areas large enough for residents to mingle and share activities and therefore the plan does not meet the standards of Sec. 6-17 (d) (6), and Sec. 6-15 (a) (3) (d) (f) (g) and

"WHEREAS, the Commission finds that the present proposal does not meet the intent of the new 1998 Plan of Conservation and Development policies and recommendations to preserve residential neighborhoods by strictly enforcing and adhering to zoning regulations and to encourage comfortable and attractive senior housing and further does not meet the standards of Sec. 6-15 (Site Plan), 6-17 (Special Permit), Sec. 6-42 [R-PHD-E Zone] nor Municipal Improvement standards . . . .

"The Commission suggests the applicant reapply with an alternative plan and/or information which addresses the above noted deficiencies to the maximum extent possible and including at least:

"1. The inclusion of some outdoor recreational use area.

"2. Alternative building(s) configuration, size, location, number of units useable, open space and recreation areas, preservation of natural topography and resources on the site to enable the Commission to deal with the verified pleading pursuant to [§] 22a-19.

"3. A revised site plan for Quarry Knoll Drive and affected areas of Quarry Knoll I and II (road circulation, parking, road construction to Quarry Ridge, roads that may need to be widened, etc.) Show the easement area to enable the Commission and Town Departments to access the impact of the changes

and naming the commission and Metcalf as defendants. While that appeal was pending, the plaintiffs filed an amendment to their application with the commission pursuant to § 8-30g (d); see footnote 3 of this opinion; addressing the concerns expressed by the commission for its denial of their first application. The commission held two public hearings on the second application on September 10, 1998, and September 15, 1998, at which Metcalf and the remaining individual defendants intervened under § 22a-19. The commission denied the amended application and again notified the plaintiffs of the bases for its decision in a letter dated September 28, 1998.[6]

on Quarry Knoll I and II sites. Applicant should submit alternative designs that are more proportional to the adjoining neighborhood in design and scale, environmentally sensitive with assurances of soil/slope stability, non-contamination of ground water and [department of environmental protection] verification of ground water quality.

"4. A final decision letter from the Wetlands Agency and Conservation Commission.

"5. A plan showing housing density reduced from the present plan.

"6. Do not include [Ridge], a private developer as a co-applicant in any new application to re-zone to [PHD-E].

"7. Applicant is asked to document and clarify the number of affordable units in the Quarry Ridge project. Testimony indicated 40% would be considered affordable per [§] 8-30g and the remainder may or may not qualify under this state law. Would all qualify and be affordable by state or federal standards in perpetuity. At the same time, a letter from the Chairman of the Housing Authority dated 3/31/98 stated that [t]he Quarry Ridge senior complex added to the stock of mixed income affordable housing that [Housing and Urban Development] is encouraging families in low, moderate and market rate apartments and that '[w]e now wish to do this for adults over [the] age of 62' . . . the question is whether some units will be marketable, or whether those will in fact be made affordable to residents by subsidy. . . ."

[6] The commission's reasons for denying the amended application were included in the letter, which provided in relevant part: "WHEREAS, the Commission noted that there is a procedural defect in the present new application in that the applicant was denied a Municipal Improvement approval in June 1998 under the previous preliminary plan and did not request nor submit new applications for Municipal Improvement per Sec. 99 of the Town Charter which requires [Municipal Improvement] approval for 1) public housing locations, 2) for acquisition of land for major re-design of public real property or public buildings, 3) the extent and location of

transportation routes whether public or privately owned, and 4) relocation, major redesign, extension of any street (Quarry Knoll roads); and therefore the Commission considered this an incomplete application. It is noted that in 1996 the Housing Authority of the Town of Greenwich and its affiliate [Knoll] granted an easement to a private for-profit corporation, Le Grande Partners, LLC, to access the Quarry Ridge property at 59 Le Grande Ave., the subject site, over the town-owned roads of the Quarry Knoll II elderly housing development, and the Housing Authority did not request [Municipal Improvement] approval from the Commission, as required by the Charter, for the granting of the easement, and therefore the Commission considered this an incomplete application; however, since the applicant had submitted this new application per . . . [§] 8-30g as a modification and amendment to the original plan, and the applicant has appealed the previous denial of the preliminary plan under [§] 8-30g, the Commission undertook a complete review and consideration of this new plan for re-zoning, special permit and site plan and made the following findings:

"WHEREAS, the Commission held public hearings on 9/10/98 and 9/15/98 and took all testimony as required by law; and

"WHEREAS, the Commission adopted the Planned Housing Design-Elderly Zone (PHD-E)—Division 4, Sec. 6-35 through 6-43 of the Building Zone Regulations, for the purpose of enabling the Housing Authority or non-profit sponsor to construct and manage affordable housing for the elderly. The standards of the zone provide for a large density bonus to be granted (in this case the application is for four times the density permitted in the underlying R-6 zone) to make it possible for ALL units to be eligible for state and/or federal financial assistance and to be offered at affordable rates in perpetuity. All applications are subject to review under Special Permit standards.

"WHEREAS, applicant proposes to construct on a 2.39 acre site a 77,000 + sq. ft. building with a footprint of 305 ft. x 65 ft., four stories high, with 92 one-bedroom apartments for independent elderly and non elderly residents (as defined by state statutes), and 42 parking spaces, but only 37 of these units (40%) will qualify as affordable under . . . [§] 8-30g standards (renting at $850/month) and the Planning and Zoning understands that the remainder will be market rate units at $1250 per month. This ratio is not in keeping with the PHD-E zone standards which call for 100% of the units to be affordable. The site is presently zoned R-6 and permits 24 multi-family dwelling units (10/acre). The proposed re-zoning to [R-PHD-E] would allow the 92-unit apartment building at a density of 38 units per acre. The site adjoins an existing PHD-E development by the Housing Authority, Quarry Knoll II, having 40 dwelling units in several buildings at a density of 25 units/acre. And the Commission finds that the site proposed for re-zoning does not meet the 1,000 feet standard for separation between developments in the R-PHD-E zones pursuant to Sec. 6-36. Adjacent to this proposed development is Quarry Knoll I, zoned R-6 and providing 50 units for the independent elderly.

"East of the site at a lower elevation is Overlook Drive in an R-12 zone

Thereafter, the plaintiffs appealed from the denial of the amended application. Each of the intervening par-

(3 single-family dwellings per acre) with some homes less than 300 feet from the proposed apartment building which will be hard to screen visually from residents below, especially night lights when deciduous trees are bare of foliage; further, the Commission finds that the adjoining residents have relied on the R-6 zoning for many years and did not expect such a drastic change from the 24 permitted units to the 92 units on 2.39 acres and the potential adverse impacts upon property values, and

"WHEREAS, the Commission recognizes that the [t]own must meet the need for affordable housing for the town's present elderly residents, (an objective of the 1998 Town Plan of Conservation and Development), but material submitted by Housing Authority indicates that these units would be open to non-residents and therefore there is a reasonable doubt that the existing local need is as great as 92 units requested; yet Greenwich residents may suffer the impacts of the scale and development of the massive apartment building, given unresolved questions about environmental, site stability and traffic issues. No income information on those on the waiting lists has been submitted as requested by [Planning and Zoning] in a letter of Sept. 4, 1998 verifying income eligibility for the 37 affordable units per . . . [§] 8-30g and therefore no positive finding can be made that the proposal meets the purposes of the PHD-E zone or the needs of present elderly residents or the ability of those on the waiting list to afford the proposed rents.

"WHEREAS, the Commission notes that the application to rezone the property to [R-PHD-E] was submitted on behalf of co-applicants—[Knoll], a non-profit sponsor affiliated with the Housing Authority of the Town of Greenwich, and [Ridge], a private for profit developer not presenting itself as a non-profit sponsor, and Sec. 6-42 of the Building Zone Regulations requires that the application for a [R-PHD-E] zone be made by the Housing Authority or a non-profit sponsor. Therefore, the Commission finds that the private developer does not and can not qualify as an applicant or co-applicant under the provision of the [R-PHD-E] zone and the request for rezoning by said party is a procedural defect and is not supportable, and therefore the joint application does not meet the standards of Sec. 6-35 and 6-42 of the Building Zone Regulations, and

"WHEREAS, the Commission notes that the property, if re-zoned to PHD-E, would provide for 100% of the units to be offered and maintained as affordable units in perpetuity in accordance with the purposes and standards of Sec. 6-35. However, the submission of the application pursuant to . . . [§] 8-30g standards overlaying the application for re-zoning to a PHD-E zone allows the applicant to achieve greater density and a REDUCTION in the number of dwellings offered as affordable to 25% of the total and to maintain them as affordable for only 30 years. The applicant (the Housing Authority) has stated that 40% of the units would be permanently restricted to affordability under [§] 8-30g standards and the remaining 60% would be market rate units. In effect, the project developed under [§] 8-30g standards would yield

far fewer affordable units than the 100% of the units which would be affordable if the issue were addressed under local zoning regulations of the R-PHD-E zone, and

"WHEREAS, the Commission notes that the site is environmentally difficult and sensitive with bedrock outcrops, varying slopes with some as steep as 37%, a wetland area/drainage corridor, and a stormwater runoff drainage problem which regularly leaves areas to the east (Overlook Drive) burdened with standing water and flooding problems. The increase in impervious surface (by replacing a small house and out buildings with a massive, institutional structure and associated parking and accessway) requires a state of the art drainage system to avoid exacerbating flooding problems. Given the severe problems in the area there is concern, and documentation provided by several consultants, that a drainage system that appears conceptually acceptable may not function as effectively as expected and problems could worsen; furthermore water quality problems may still be present, given the known history of site contamination; and therefore the plan does not adequately address these concerns to enable the commission to make a positive finding that the standards of Sec. 6-17 (d) (3) of the Building Zone Regulations have been met; and

"WHEREAS, the Commission notes that a large amount of blasting/rock cutting will be required to construct a parking area and driveway, within 10 feet of an existing residential structure housing elderly residents of Quarry Knoll II and the applicant has not addressed the special procedures which must be used to protect this structure and preserve its foundation support as noted in the consultant's report of David Freed of Gibble, Norden and Champion, and the Commission finds that these are issues of health and safety for Housing Authority residents, and Le Grande Avenue residents whose homes back up to the site, which the applicant has not provided information on or resolved as part of their submission, and therefore the Commission cannot make a finding that the plans meet the standards of the Building Zone Regulations, including Sec. 6-1 (a), (1), (3) (7) or (8) and 6-17 (d) (4), (11); and

"WHEREAS, the Commission reviewed the Sept. 8, 1998 report submitted by ALTA, (an environmental engineering firm who had reviewed the applicant's report 'Environmental Site Assessment Report-Soil Remediation' prepared by Hygenix, Inc. dated April to December 1997, which was submitted to [the inland wetlands and watercourses agency] as part of a permit application and which contained information regarding the types of contaminants found on the site and their removal), and finds that the issues of water quality, remaining contaminants and composition of fill on site were not adequately addressed by the applicant, the environmental investigation and remediation of the property are not sufficient and attainment of pertinent environmental cleanup criteria has not been adequately demonstrated for this site; and further the permit issued by [the inland wetlands and watercourses agency] addresses only the wetland restoration issue and doesn't address the quality of water which had been raised in the [inland wetlands and watercourses agency] staff report 'that existing ground water may have

ties in the administrative proceedings who opposed that application was named as a defendant in the appeal.

been contaminated.' The Commission expressed concern that contaminants, if any exist in the ground water, may flow off site into downstream properties and out into Long Island Sound, and this issue should have been addressed by the applicant in securing review and comment by the CT Department of Environmental Protection, especially since this issue was raised in the verified pleading filed pursuant to Sec. 22a-19 therefore a positive finding cannot be made that the plan meets the standards of Sec. 6-1 (a) (1) (8) and Sec. 6-17 (d) (1) (6), and the Commission cannot make positive findings per Sec. 22a-19 on this plan, and

"WHEREAS, the Town's Conservation Director reiterated in a memo of September 3, 1998 the same concerns previously expressed in a memo dated 4/17/98 which notes that the site was contaminated with lead and arsenic. While affected soils may have been removed from the site, the question of soil structure stability, which can be compromised when ash mixes with soil, has not been addressed. The Conservation Director suggests the need for geotechnical analysis by a soils engineer to determine if soils can support the proposed structures, particularly any footings for the residence in the unknown quality and quantity of fill brought to the site, the berm for a drainage basin and the parking lot; and further the Commission notes that in a report submitted by David Freed of Gibble, Norden, Champion Inc., a consulting engineering firm, these same questions and other geo-technical engineering issues were raised regarding the plans submitted and materials not submitted by the applicant at the time of this final plan filing, including no [department of environmental protection] approvals or findings to indicate that the site is compliant with State or Federal [department of environmental protection/environmental protection agency] standards and no environmental assessment was submitted, and therefore the Commission finds that the application is deficient and has not adequately addressed or supported a positive environmental finding and therefore the Commission finds that the standards of Sec. 6-1 (a) (1) and Sec. 6-17 (d) (1) and (6) are not met, and

"WHEREAS, the Commission has received a verified pleading pursuant to Sec. 22a-19 of the Connecticut General Statutes alleging unreasonable pollution, impairment or destruction of trees and other natural resources and that the Commission should have been presented and considered alternatives to this proposal in order to make findings as to whether there is a more reasonable, feasible, prudent alternative that would have less impact on natural resources. The Commission finds the applicant's presentation and application materials did not provide alternatives to the proposed submitted plan which the applicant stated had been explored and abandoned at the time of preliminary plan and even at this time of the modified final site plan application. The opposition's representatives did present alternatives and discussed these at the hearing on Sept. 10, 1998 but the applicant dismissed these alternatives summarily. New verified pleadings were filed

by the opposition on Sept. 10, 1998, which places a requirement on the Commission to examine alternatives under the Sec. 22a-19 pleading; and the Commission has no alternatives submitted by the applicant, and therefore cannot make positive findings at this time and the verified pleading raises questions and unresolved issues, and since the new final plan does not change nor reduce the amount of site coverage, excavation, or tree removal required for this development, the Commission finds that there are significant environmental adverse impacts which could potentially adversely affect adjoining residential properties and therefore the plan does not meet the standards set in the new 1998 Plan of Conservation and Development nor the Building Zone Regulations, Sec. 6-17 (d) (1), (4) and (6) and

"WHEREAS, the Commission finds that the proposal, if approved in its present form, would add a large housing project in an area of Town where there is a large concentration of subsidized housing (sponsored by the Housing Authority)—Agnes Morley Heights, Wilbur Peck Court, Town Hall Annex and Quarry Knoll I and II. The Commission has concerns about the long-range planning impacts of such concentration; and that proper long-range planning demands avoiding concentrations of publicly supported housing in one area and the location of such housing be spread thru various parts of town, and further the Commission finds that the re-zoning of this property to R-PHD-E does not meet the 1,000 ft. separation standard between properties zoned R-PHD-E and may exceed the zoning regulation limit of 225 persons within an R-PHD-E development if both the existing Quarry Knoll II and this Quarry Ridge development of 92 units were considered one R-PHD-E zoned property, and therefore the plan does not meet the standards of Sec. 6-36; and

"WHEREAS, the Commission finds that the proposed height, bulk and scale of this building presents a mass that far exceeds the scale of housing in adjoining R-6 and R-12 zoned neighborhoods and therefore does not meet the standards of Sec. 6-17 (d) (9) (11) and 6-15; and further . . . the Commission recommends that the proposal be more in keeping with the scale and bulk of the existing neighborhood, perhaps in two or more buildings, and more in keeping with the scale of adjacent Housing Authority housing at Quarry Knoll I and II, both designed at a smaller scale with several buildings of attached and detached housing; and

"WHEREAS, the Commission received no revised site plan for the total layout of one way town roads on Quarry Knoll I and II and the applicant's engineering plan showing the driveway cut into the adjoining Quarry Ridge property does not indicate turning radii to prove beyond a reasonable doubt that moving vans, service and delivery vehicles can safely turn in and out of said new driveway without encroaching upon the oncoming vehicle lanes, and the opposition's traffic study, submitted on Sept. 10, 1998, by DLS Consulting of Windsor, CT., notes that access to this 92 unit structure by an SU-30 vehicle (a standard [United Parcel Service (UPS)] truck) would actually encroach on the exiting lane and there are 4 foot rock walls on both sides of this driveway which would limit sightlines and preclude moving over to the side of a roadway and would necessitate backing up of vehicles—

The two actions subsequently were consolidated by the trial court, *McWeeny, J.*, in January, 1999.

if at all possible. This consultant report also notes that if an SU-30 UPS truck were to enter the service area on the south side of the building, there is no turnaround area available and the truck would have to back all of the way across the building to the northerly service area, and this vehicle cannot negotiate the circle in the middle of the parking area, and needless to say the WB-40 moving van design would have even more difficulty accessing the site than the SU-30 UPS van, and for these reasons therefore, the Commission finds that there is an unsafe and unacceptable potential traffic problem for the 92 unit residents as well as the existing elderly residents of Quarry Knoll I and II roads, pedestrians and drivers. The Commission finds that the applicant did not address these turning radii and circulation issues which were raised in the previous letter of denial, and that letter had indicated that a revised site plan is needed because access to Quarry Ridge is proposed to be thru Quarry Knoll whose traffic circulation patterns may need to be changed and the applicant noted that there would be a loss of parking spaces, but did not provide a detailed plan of relocation of said spaces, but made general indications that there were grassed areas that could be converted to parking spaces, without noting specific locations, and therefore this newly modified final plan does not meet the standards of Sec. 6-17 (d) (8) (11) and 6-15 (a) (2), (c), (d), (e), (g), and

"The Commission notes that the current parking formula and circulation system was designed years ago to serve the 90 dwelling units in Quarry Knoll I and II developments. The Quarry Ridge building with 92 units was initially intended to access the site from Le Grande Avenue which was quickly seen as not sufficient or adequate to handle the access and traffic impact in that location for the proposal and hence the need and reason why access is shown thru the existing elderly development; however, such access raises the issue for the applicant to submit a request for a Municipal Improvement approval for the Housing Authority deed stipulation and granting of an access easement over its Quarry Knoll property to [Ridge], a for profit corporation and co-applicant on town-owned property; this [Municipal Improvement] request has not been submitted with this newly modified plan and therefore the application is deficient and access cannot be granted to a private developer to access thru a town-owned site without said [Municipal Improvement], and the Commission finds that this represents a procedural defect in the application, and

"WHEREAS, the Commission notes that Robert Bass, a traffic consultant from Milone and McBroom, has indicated that this project, in conjunction with the adjacent Quarry Knoll I and II, may exceed 100,000 sq. ft. and 200 parking spaces which are the thresholds for the State Traffic Commission (STC) to become involved and a determination from the STC is needed as to whether or not this development should be considered a major traffic generator and therefore the Commission notes that if such a finding is made by the STC, major roadway design changes within the existing Quarry Knoll

I and II and adjacent roads, such as Davis and East Elm street may be needed, and therefore the application is deficient in providing sufficient information to address these issues, and further the Commission notes that the 42 parking spaces provided for these 92 units is insufficient because the 56 market rate units will likely have more than one person per household and with incomes sufficient to pay over $1250 per month, could have more than one car and therefore Sec. 6-155 of the [Building Zone Regulations] requiring 1 parking space per one bedroom unit should be used for parking calculations which would then require 56 spaces for those units and 12 spaces for the [§] 8-30g elderly 36 units (ratio of 1 space per 3 elderly units in the [R-PHD-E] zone) for a total of 68 parking spaces to be required on site for the 92 units, and therefore the Commission finds that the plans do not meet the standards of Sec 6-155, 6-15 (a) (2) (d) and 6-17, and

"WHEREAS, the Commission notes this is not the first proposal for development of 59 Le Grande Avenue that has been found unacceptable. Years ago the [Planning and Zoning] Board of Appeals rejected a proposal for a convalescent nursing home because of its size and expected traffic considered unsafe for the Le Grande Avenue area with its narrow streets. Ultimately the Board approved a smaller structure—a 22,000 sq. ft., 2 1/2 story building with a footprint of 200 feet by 45 feet. The building was never constructed.

"WHEREAS, the Commission finds that even on the newly modified final plans, that there is still insufficient useable safe and pleasant outdoor recreation space, suitably graded, for the independent elderly who will live on the site and need walking and seating areas on the grounds of their home in areas large enough for residents to mingle and share activities and therefore the new plan still does not meet the standards of Sec. 6-17 (d) (6), and Sec. 6-15 (a) (3), (d), (f), (g) and

"WHEREAS, the Commission finds that the present proposal does not meet the intent of the new 1998 Plan of Conservation and Development policies and recommendations to preserve existing land use patterns and preserve character of residential neighborhoods, to avoid large increases in impervious surfaces so as to preclude flooding and drainage impacts upon residential areas by strictly enforcing and adhering to zoning regulations and to encourage comfortable and attractive senior housing and further does not meet standards of Sec. 6-15 (Site Plan), 6-17 (Special Permit), and Secs. 6-35-42 ([R-PHD-E] Zone), and

"WHEREAS, the Commission finds that the SAMA report (Site Analysis and Market Analysis) which the applicant submitted to [Housing and Urban Development (HUD)] which is required for HUD insured mortgages, and submitted by the applicant at the close of the hearing on September 15 did not provide evidence of income eligibility of the 137 persons on the Housing Authority waiting list (55 non-seniors, 54 non-residents) to show that there is a need or ability to pay for these units with rents of $850—1250 a month, nor did the report confirm that the site is now compliant with all federal and state standards for construction on a site that was formerly a contaminated site, no additional moneys are shown for additional geo-technical studies for soils, fill analysis or structural analysis vis a vis existing bedrock,

On December 21, 1999, the trial court, *Axelrod, J.*, after finding that the plaintiffs had been aggrieved by the decision of the commission, sustained their appeals and ordered the commission to grant "all of the approvals requested by the applicants . . . ."[7] In its memorandum of decision, the trial court first rejected the

and it is unclear whether HUD was aware of the need to do further testing and analysis regarding these issues on site, and further that SAMA report states that the project could still be feasible with less than 92 units, and the report indicated that 75% of the units were to be market rate and only 25% were to be deed restricted compared to what the applicant has represented to the Commission to be 40% to be affordable under [§] 8-30g so there is a question as to the certainty of the number of affordable units, and in fact the applicant has not submitted with either application a copy of the proposed Declaration of Restrictions for the Affordable Housing units to assure compliance with [§] 8-30g nor indicated on the plans which units are to be permanently deed restricted to show that 40% of the units as represented by the applicants will be earmarked for [§] 8-30g,

"WHEREAS, the Commission finds that sufficient evidence has been presented regarding potential environmental and geotechnical problems that it is impossible for the commission to determine that the site is now safe for residential purposes at the size and scale proposed and that potential adverse impacts on the adjacent neighborhoods have been mitigated to the extent possible; and in the interests of protecting substantial public interests in the health, safety and welfare of the public, further steps need to be taken to resolve concerns; and

"WHEREAS, the Commission notes that its decision to reject the preliminary application on June 30, 1998 and to suggest that a new plan be submitted showing reduced housing density did not elicit a response from the applicant that such reduced density would have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units; and

"THEREFORE BE IT RESOLVED, that application #98-4 as submitted by Bruce Cohen, authorized agent for [Ridge], record owner and [Knoll], contract purchaser, for a change of zone from the R-6 to R-PHD-E and for a map change for the subject property and for a site plan and special permit approval for the construction of 92 dwelling units for elderly residents being proposed under . . . [§] 8-30g on 2.4 acres of property at 59 Le Grande Ave. is hereby denied. . . ."

The commission's suggestions for reapplication were nearly identical to those included in the denial of the first application.

[7] The trial court ordered the following minor revisions to the application: "(A) The affordable units are to be in perpetual restriction and not limited to thirty years. (B) Forty (40) percent of the 92 units or 37 units are to be affordable."

694

defendants' claim that it lacked subject matter jurisdiction over the plaintiffs' appeal due to the plaintiffs' failure to exhaust their administrative remedies. Specifically, the defendants had contended that the plaintiffs were required to refer the denial of the municipal improvement portion of their applications to the representative town meeting pursuant to § 100 (b) of the Greenwich charter before appealing from the commission's decision to the trial court.[8] The trial court concluded that because this court "has routinely sanctioned

[8] Section 99 of the Greenwich charter requires approval from the commission for municipal improvement projects. It provides: "Municipal improvements; approval.

"(a) After the passage of this Article no action, other than the making of studies or surveys, shall be taken by any Town agency, the Board of Education or the Housing Authority on any proposal involving;

"(1) The location, relocation, major redesign, extension or abandonment of any street or sewage disposal plant;

"(2) The acquisition of land for, or the location, relocation, abandonment, sale, lease or major redesign of public real property or public buildings, including schools;

"(3) The extent and location of transportation routes and terminals whether publicly or privately owned; or

"(4) The location of public housing projects.

"Until such proposal has been submitted to and approved by the Commission or has been approved by the Representative Town Meeting as herein provided."

Section 100 of the Greenwich charter provides: "Municipal, improvements; referral to Representative Town Meeting.

"(a) The failure of the Commission to act upon any proposal, submitted to it pursuant to Section 99 hereof, within ninety (90) days after such submission shall be deemed to constitute an approval thereof. The Commission may, by resolution adopted prior to the termination of the ninety (90) day period and for sufficient reasons to be stated in the resolution, defer approval for any length of time reasonably necessary.

"(b) In the event of the approval or disapproval or deferment by the Commission of any such proposal, the Commission shall cause a notice of such action to be published in a newspaper having a general circulation in the Town and the Town Agency, the Board of Education or the Housing Authority having original jurisdiction of the matter, or any person owning property within the Town, may, within thirty (30) days from the date of publication of such notice by the Commission, refer such proposal to the Representative Town Meeting. The Representative Town Meeting shall have power to approve such proposal or to reject it."

similar direct appeals from decisions of zoning and planning commissions without requiring prior resort to the local zoning board of appeals, so too should a direct appeal be sanctioned without requiring resort to the representative town meeting."

Second, the trial court concluded that the commission had not acted upon the plaintiffs' municipal improvement proposal within the ninety day time period prescribed by § 100 (a) of the Greenwich charter, and that, therefore, pursuant to the charter, the commission had automatically approved the proposal. See footnote 8 of this opinion. Third, the trial court rejected the commission's claim that the access to the site at issue was illegal because the plaintiffs had failed to apply for an approval for an easement as part of the municipal improvement application.[9] The trial court concluded that because Knoll was the contract purchaser of the property and Knoll already owned the adjacent parcel, there would be no need for Knoll to obtain an easement if the applications were granted.

Finally, the trial court examined each of the twenty-seven reasons offered by the commission in support of its denial of both of the plaintiffs' applications. With respect to each reason, the trial court addressed whether the commission had met its burden under § 8-

---

[9] Essentially, the commission maintained that the plaintiffs had not sought municipal improvement approval specifically for an easement granted in October, 1996, from Knoll and the housing authority to Le Grande Partners, LLC, the predecessor to Ridge. According to its express terms, however, the easement became effective *only* in the event of two circumstances: (1) the inability of either Ridge or the housing authority to acquire title to the property by a specified date; or (b) the inability of Ridge to obtain approval from the commission for a development using means of access *other than the easement*. Therefore, the purpose of the easement was to provide an alternative access to the property in the event that Ridge or the housing authority did not acquire title to the property.

At the time of this action in the trial court, Ridge was still the contract purchaser of the property. Thus, the easement had not yet been triggered.

30g (c) (1) (A) to show that the reason was supported by sufficient evidence in the record. The trial court then considered, with respect to each reason, whether the commission had met its burden under § 8-30g (c) (1) (B) through (D) to show by sufficient evidence in the record that: (1) the reason was necessary to protect a substantial public interest in health, safety or other matters that the commission may legally consider; (2) such public interest clearly outweighed the need for affordable housing; and (3) such public interest could not be protected by reasonable changes to the affordable housing development.[10]

The court determined that twenty-one of the twenty-seven reasons given by the commission for denying the applications were supported by sufficient evidence in the record. It further determined that the commission had met its burden to show by sufficient evidence in the record that fourteen of those twenty-one reasons were also necessary to protect substantial public interests in matters that the commission legally was authorized to consider. Of the fourteen reasons wherein the commission had satisfied its burden under subparagraphs (A) and (B) of § 8-30g (c) (1), however, the court concluded that the commission had failed to meet its burden with respect to thirteen of those reasons to show, by sufficient evidence in the record, that reasonable changes to the proposal would not protect the

---

[10] With regard to subparagraph (D) of § 8-30g (c) (1); see footnote 3 of this opinion; the trial court rejected the argument advanced by the commission and the individual defendants that the plaintiffs had the burden under § 22a-19 (b) to show whether there were other " 'feasible and prudent alternatives' " to the proposed development. The court concluded that under § 8-30g (c) (1) (D), it was the commission's burden to show by sufficient evidence that the public interest could not be protected by reasonable changes to the affordable housing development. In addition, the court determined that, to the extent that § 8-30g (c) (1) (D) conflicted with § 22a-19 regarding the burden of proof, § 8-30g (c) (1) (D) controlled because it was enacted after § 22a-19.

public interest. Finally, the trial court concluded, with respect to all twenty-seven reasons offered by the commission, that the commission had failed to meet its burden to show by sufficient evidence in the record that the public interest clearly outweighed the need for affordable housing.[11] Specifically, the trial court determined that the commission had "failed to address the balancing requirement of § 8-30g (c) (1) (C)" for each reason proffered in support of its decision to deny the plaintiffs' application. These separate appeals by the commission and the individual defendants followed.

During the pendency of these appeals, Ridge conveyed title to the property to Greyrock, which intends to develop it as an affordable housing complex. Ridge also assigned all of its rights, title and interest in these appeals and in the judgment of the trial court to Greyrock. Thereafter, Greyrock filed a motion seeking to be substituted for Ridge and Knoll as the party plaintiff in this action. The commission opposed Greyrock's motion to be substituted as the party plaintiff because the substitution of Greyrock for Knoll "rais[ed] the issue of standing" and the ability of Greyrock to proceed with the application at issue in these appeals. The commission claimed that Greyrock had no easement for access to the site and, therefore, had different rights in the appeals than had Ridge. We granted the motion allowing Greyrock to be substituted as the party plaintiff, but nevertheless allowed the commission to file supplemental briefs addressing the propriety of the substitution, at which time the commission made arguments identical to those it had made in its earlier opposition to

---

[11] The chart reproduced from the appendix of Greyrock's supplemental brief and attached as an appendix to this opinion shows the trial court's analysis under § 8-30g (c) (1) (A) through (D) of the twenty-seven reasons offered by the commission in support of its decision to deny the plaintiffs' applications. The bracketed material in the appendix represents changes made to conform the chart to this opinion.

Greyrock's motion to be substituted as the party plaintiff.

In their initial briefs, the defendants raised six issues.[12] Three issues addressed subject matter jurisdiction and three issues challenged the merits of the trial court's decision. Specifically, both the commission and the individual defendants claim that the trial court improperly determined that the plaintiffs were aggrieved by the commission's denial of the applications in the absence of evidence that the plaintiffs owned the property. The commission further argues, as it contended in its opposition to Greyrock's motion to be substituted as the party plaintiff, that Greyrock lacks standing to proceed in these appeals because it has no easement for access to the property and, therefore, lacks the requisite legal rights to proceed with the proposed development. In addition, the commission contends that the trial court improperly concluded that it had subject matter jurisdiction over the action despite the plaintiffs' failure to appeal the denial of their municipal improvement proposal to the representative town meeting pursuant to § 100 (b) of the Greenwich charter.

As to the merits of the trial court's decision, the commission claims that the trial court improperly concluded that under § 100 (a) of the Greenwich charter, the commission's failure to act on the plaintiffs' request for approval of the municipal improvement proposal within ninety days of its submission acted as an automatic approval of the proposal.[13] Additionally, both the

---

[12] Three issues were raised by both the commission and the individual defendants. Three additional issues were raised solely by the commission.

[13] The plaintiffs, in addition to challenging the defendants' contentions, argue, as an alternative ground for affirming the judgment of the trial court, that Metcalf lacked standing to intervene in the first appeal to the Superior Court because he did not reside in Connecticut at the time of trial or at any time thereafter. The plaintiffs further maintain that the trial court's decision sustaining the first appeal cannot be challenged by any of the other individual defendants who had intervened in the action involving the second application. Thus, the plaintiffs maintain that the remaining intervening defendants' challenge to the trial court's granting of the second application

commission and the individual defendants contend that the trial court, in concluding that under § 8-30g (c) (1) (D), the commission, rather than the plaintiffs, had the burden of proving that "no feasible and prudent alternative" to the proposed development existed, improperly determined that § 22a-19 (b) was repealed by implication. Finally, the defendants claim that the trial court improperly concluded that the commission's decision was defective because the commission had not stated that the reasons for its decision "clearly outweighed" the need for affordable housing.

Just prior to oral argument in this action, Greyrock filed a letter with this court concerning the retroactive application of an amendment to § 8-30g (c), which became effective October 1, 2000. That amendment, No. 00-206, § 1 (g) of the 2000 Public Acts (P.A. 00-206, § 1 [g]),[14] affects our scope of review in an appeal from a

is purely academic because even if they were to prevail, the granting of the first application will stand, thus rendering moot the defendants' challenge to the trial court's judgment on the second application. We are not persuaded.

The commission is a defendant in both actions before this court and its standing is not at issue. Therefore, even if we were to assume that Metcalf lacked standing to intervene in the action involving the first application, the commission has standing to challenge the court's granting of that application. Accordingly, the remaining individual defendants' challenge to the trial court's granting of the second application is not moot.

[14] Public Act 00-206, § 1 (g), which amended § 8-30g (c), provides: "[(c)] (g) Upon an appeal taken under subsection [(b)] (f) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that [(1) (A)] the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. [; (B)] The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1) (A) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; [(C)] (B) such public interests clearly outweigh the need for affordable housing; and [(D)] (C) such public interests cannot be protected by reasonable changes to the affordable housing development, or (2) (A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses, and (B) the development is not assisted housing, as defined in subsec-

zoning commission's denial of an affordable housing land use application under § 8-30g (c). Consequently, we, sua sponte, ordered the parties to file supplemental briefs concerning the retroactive application of the amendment. With respect to that issue, Greyrock argues, as an alternative basis for affirming the decision of the trial court, that P.A. 00-206, § 1 (g), should be applied retroactively because it clarifies that, under § 8-30g (c), now subsection (g),[15] the commission "has the burden of proving the correctness of its decision, not just the existence of 'sufficient evidence' to support it." Accordingly, Greyrock contends that the commission did not meet this burden. Conversely, both the commission and the individual defendants maintain that P.A. 00-206, § 1 (g), should not be applied retroactively, but that even if it is so applied, it does not alter the burden of proof under § 8-30g (c).

Addressing the defendants' jurisdictional claims first, we conclude that the trial court properly found that the plaintiffs were aggrieved by the decision of the commission. We further note that, by granting Greyrock's motion to be substituted as the party plaintiff, we determined that Greyrock has standing in this appeal. In addition, we conclude that the trial court properly determined that it had subject matter jurisdiction over the action despite the plaintiffs' failure to refer the denial of their municipal improvement proposal to the representative town meeting pursuant to § 100 (b) of the Greenwich charter.

tion (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it."

The material in brackets indicates the deleted portions of § 8-30g (c) as previously codified before the amendment.

[15] For purposes of clarity, we refer herein to the codification of § 8-30g as it existed prior to P.A. 00-206, § 1 (g). See footnote 23 of this opinion and the accompanying text.

Turning to the substantive arguments on appeal, we conclude that the trial court properly determined that, under § 100 (a) of the Greenwich charter, the commission's failure to act on the plaintiffs' request for approval of the municipal improvement proposal within ninety days of its submission acted as an automatic approval of the proposal. We further conclude that P.A. 00-206, § 1 (g), should be applied retroactively because it clarifies the original intent of § 8-30g (c) (1) (A) through (D), and that the standard of judicial review we set forth in this opinion applies to the new trial we order herein. See part IV A of this opinion. Additionally, we conclude that the trial court improperly determined that the commission's decision was defective to the extent that the commission had not stated that the reasons for its decision clearly outweighed the need for affordable housing. Finally, we conclude that the trial court properly determined that under § 8-30g (c) (1) (D), the commission, rather than the plaintiffs, had the burden of proving that "no feasible and prudent alternative" to the proposed development existed.

I

"The question of aggrievement is essentially one of standing . . . ." *Beckish* v. *Manafort*, 175 Conn. 415, 419, 399 A.2d 1274 (1978). Because "[t]he issue of standing implicates this court's subject matter jurisdiction," we address it first. *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 21, 31, 755 A.2d 860 (2000); *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, 241 Conn. 546, 552, 698 A.2d 245 (1997) ("[i]t is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction").

A

We first address the argument of both the commission and the individual defendants that the plaintiffs failed to meet their burden of proving aggrievement because

they did not provide any evidence of their ownership of the property at the commencement of this action in the trial court. Specifically, the defendants maintain that the certified copy of the deed to the property introduced by the plaintiffs in the trial court, which established that Ridge was in fact the owner of the property as of January 6, 1998, was sufficient to show only that the plaintiffs owned the property as of that date, not to prove that Ridge owned it at the start of this action in the trial court. We disagree.

"A person does not become aggrieved until the zoning authority has acted, and the question of aggrievement is a jurisdictional one for the court. . . . To be entitled to an appeal, the plaintiff[s] [were] required to allege and prove that [they were] aggrieved by the decision of the commission." (Citation omitted.) *Fletcher* v. *Planning & Zoning Commission*, 158 Conn. 497, 501, 264 A.2d 566 (1969). "The fundamental test by which the status of aggrievement . . . is determined encompasses a well-settled twofold determination. First, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) *Winchester Woods Associates* v. *Planning & Zoning Commission*, 219 Conn. 303, 307, 592 A.2d 953 (1991). "Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Bakelaar* v. *West Haven*, 193 Conn. 59, 66, 475 A.2d 283 (1984); *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control*, 247 Conn. 95, 103, 717

A.2d 1276 (1998). "Aggrievement is an issue of fact . . . and credibility is for the trier of the facts. . . . Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts." (Internal quotation marks omitted.) *Winchester Woods Associates* v. *Planning & Zoning Commission,* supra, 308.

The plaintiffs' appeal from the commission's decision in this action attacked the denial of their application of February 5, 1998, and their application of July 22, 1998. The trial court reached a general conclusion that the plaintiffs had been aggrieved by the action of the commission in denying both applications. This court previously has stated that "the mere denial of an application does not establish aggrievement." *Fletcher* v. *Planning & Zoning Commission,* supra, 158 Conn. 502. The record reflects, however, and indeed, the defendants concede, that at the hearing before the trial court, the plaintiffs introduced a certified copy of the deed to the property that established that Ridge was in fact the owner as of January 6, 1998. See id. (finding aggrievement based upon plaintiff's status as owner or contract purchaser).

The thrust of the defendants' claim, for which they give no authority, appears to be that in the absence of testimonial evidence in support of the deed indicating that Ridge was *still* the owner of the property at the time of the hearing, tne plaintiffs did not meet their burden of establishing aggrievement. This claim is without merit. As this court has stated previously, "[w]here the issue of title or ownership is directly involved, the proper way to prove title is by the production of the original documents or certified copies from the record." (Internal quotation marks omitted.) *Velsmid* v. *Nelson,* 175 Conn. 221, 229, 397 A.2d 113 (1978). Moreover, "[w]hen ownership has once attached, it is presumed to have continued until it has been shown to have ceased."

*Ealahan* v. *Ealahan*, 98 Conn. 176, 184, 119 A. 349 (1922). Given the trial court's role as the finder of facts, there was sufficient evidence before the trial court as to Ridge's status as owner of the property for the court to conclude that the plaintiffs were aggrieved. See *Winchester Woods Associates* v. *Planning & Zoning Commission*, supra, 219 Conn. 308.

B

We next address the commission's claim that, because Greyrock has no easement for access to the property, it lacks the requisite legal right to proceed with the proposed development in accordance with the applications upon which these appeals are based, and therefore, lacks standing. In regard to this issue, the commission advances the same arguments that it had raised in its opposition to Greyrock's motion to be substituted as the plaintiff in this action. A brief review of certain relevant facts is necessary for an understanding of this claim.

One of the grounds upon which the commission had denied the plaintiffs' applications for the affordable housing complex was that the plaintiffs had not sought municipal improvement approval from the commission for an easement providing Ridge with access to the property where the proposed complex was to be built. See footnotes 5 and 6 of this opinion. In response to this claim, the trial court concluded there was no need for Ridge to obtain an easement to access the property. It reasoned that, because Knoll was the contract purchaser of the property and Knoll already owned the adjoining parcel of land, an easement would not be necessary if the applications were granted.

As noted previously in this opinion, during the pendency of these appeals, Greyrock moved to be substituted as the party plaintiff, contending that Ridge had conveyed to Greyrock fee simple title to the subject

premises. Greyrock further noted that Ridge had assigned all of its rights, title and interest in and to these appeals, as well as its interest in the judgment of the trial court, to Greyrock, and that Greyrock intended to follow through with the plans to build an affordable housing complex on the property. The commission opposed that motion, contending that Greyrock lacked standing. Specifically, the commission argued that because Greyrock did not own the property adjoining the site in issue, it needed an easement to gain access to the site. Because Greyrock did not obtain municipal improvement approval from the commission for the easement, the commission argued that Greyrock lacked the necessary legal rights to proceed with these appeals.

In granting Greyrock's motion to be substituted as the party plaintiff, we necessarily recognized that Greyrock had succeeded to all rights, title and interest in the property that the prior plaintiffs had possessed, *including the right to access to the property*. In fact, the deed of conveyance from Ridge to Greyrock expressly includes "all right, title and interest of [Ridge] in and to a certain *Easement Agreement dated December 14, 1999 by and between Quarry Knoll II Corporation and Quarry Ridge Greenwich LLC*." (Emphasis added.) The easement agreement referred to in the deed; see footnote 9 of this opinion; provided that in the event that Knoll did not purchase the property, it nevertheless would offer an easement for access to the party that ultimately purchased the property from Ridge. Therefore, Greyrock had standing to proceed with these appeals. Although we granted the commission's motion to file supplemental briefs on this issue, the commission advanced no new arguments. Accordingly, we conclude that Greyrock has standing in this action.

II

We next address the commission's claim that the trial court lacked subject matter jurisdiction over the

municipal improvement portion of the plaintiffs' underlying appeals because the plaintiffs had failed to exhaust their administrative remedies. Specifically, the commission contends that, because the plaintiffs opted to forgo appealing from the municipal improvement portion of their application to the representative town meeting, as required under § 100 (b) of the Greenwich charter; see footnote 8 of this opinion; and instead, commenced an action in the Superior Court pursuant to § 8-30g (b), the plaintiffs failed to exhaust an available administrative remedy. That failure, the commission claims, deprived the trial court of subject matter jurisdiction over the municipal improvement portion of the plaintiffs' appeal. We disagree.

Section 100 (b) of the Greenwich charter provides that if the commission approves or defers a municipal improvement application, "the Board of Education or the Housing Authority having original jurisdiction of the matter, or any person owning property within the Town, *may . . . refer* such proposal to the Representative Town Meeting" who in turn, has the "power to approve such proposal or to reject it." (Emphasis added.) General Statutes (Rev. to 1997) § 8-30g (b) provides that "[a]ny person whose affordable housing application is denied or is approved with restrictions . . . may appeal such decision" to the Superior Court. We conclude that referral to the representative town meeting under the Greenwich charter was an alternative remedy and, therefore, that the plaintiffs were entitled to appeal the decision of the commission directly to the Superior Court under § 8-30g (b).

In *Weinstein* v. *Zoning Board*, 214 Conn. 400, 402 n.2, 572 A.2d 348 (1990), this court examined a similar Stamford charter provision, which stated that a zoning board's decision to approve a zone change *"shall be referred* by the Zoning Board to the Board of Representatives" when other property owners, who have been

affected by the action of the zoning board, have petitioned for referral of the matter to the board of representatives. (Emphasis added.) The plaintiff in *Weinstein* had appealed from the decision of the zoning board directly to the Superior Court pursuant to General Statutes § 8-10,[16] without first referring the decision to the board of representatives. Id., 402.

In *Weinstein*, the court rejected the trial court's conclusion that it lacked subject matter jurisdiction based upon the plaintiff's failure to exhaust administrative remedies. Id., 406. The court concluded that the referral to the board of representatives under the town charter was an alternative remedy and, therefore, that the plaintiff, as an aggrieved person, was entitled to appeal directly to the Superior Court under § 8-10. Id. The court stated: "[T]he Stamford charter gave a 'choice' of two alternative remedies, necessarily implying that a person aggrieved was free to elect between them and not have the 'choice' made for him by others. . . . [T]he zoning board of Stamford is the 'final zoning authority' within the intent of § 8-10 for those, such as the plaintiff, who have not exercised the alternative of petitioning for a referral to the board of representatives. It is clear, therefore, that the plaintiff was entitled to appeal from the action of the zoning board to the Superior Court pursuant to § 8-10." Id., 406–407.

In the present case, § 100 (b) of the Greenwich charter provides that a person or agency "*may . . . refer*" a municipal improvement application to the representa-

[16] General Statutes § 8-10 provides: "Appeals procedure to apply to all municipalities. The provisions of sections 8-8 and 8-9 shall apply to appeals from zoning boards of appeals, zoning commissions or other final zoning authority of any municipality whether or not such municipality has adopted the provisions of this chapter and whether or not the charter of such municipality or the special act establishing zoning in such municipality contains a provision giving a right of appeal from zoning boards of appeals or zoning commissions and any provision of any special act, inconsistent with the provisions of said sections, is repealed."

tive town meeting in the event that the commission approves or defers the application. (Emphasis added.) As in *Weinstein*, the referral to the representative town meeting under the charter was an alternative remedy. The plaintiffs in this action were presented with a choice of two alternative remedies, namely, either to refer the decision of the commission to the representative town meeting under the provisions of the charter, *or* to appeal the decision directly to the Superior Court pursuant to § 8-30g. The commission was the final planning and zoning authority under § 8-30g for applicants, such as the plaintiffs here, who had not exercised their option of referring the decision of the commission to the representative town meeting. We therefore conclude that the trial court properly determined that the plaintiffs were not required to resort to the representative town meeting before appealing the denial of their municipal improvement proposal directly to the Superior Court. Indeed, "[o]ur conclusion is buttressed by the fact that we have routinely sanctioned similar direct appeals to the court from decisions of zoning and planning and zoning commissions without requiring prior resort to the local zoning boards of appeals. See, e.g., *TLC Development, Inc.* v. *Planning & Zoning Commission*, 215 Conn. 527, 577 A.2d 288 (1990) (appeal from denial of site plan approval by Branford commission); *Schwartz* v. *Planning & Zoning Commission*, 208 Conn. 146, 543 A.2d 1339 (1988) (appeal from denial of site plan approval by Hamden commission); *Goldberg* v. *Zoning Commission*, 173 Conn. 23, 376 A.2d 385 (1977) (appeal from denial of site plan approval by Simsbury commission); *Marandino* v. *Planning & Zoning Commission*, 21 Conn. App. 421, 573 A.2d 768 (1990) (appeal from denial of site plan approval by Greenwich commission); *Allied Plywood, Inc.* v. *Planning & Zoning Commission*, 2 Conn. App. 506, 480 A.2d 584, cert. denied, 194 Conn. 808, 483 A.2d 612

(1984) (appeal from denial of site plan approval by South Windsor commission)." *Castellon* v. *Board of Zoning Appeals*, 221 Conn. 374, 382–83, 603 A.2d 1168 (1992).[17] Accordingly, we conclude that the trial court properly determined that it had subject matter jurisdiction over the municipal improvement portion of the plaintiffs' appeals.

## III

We next consider the commission's contention that the trial court improperly determined that the municipal improvement portion of the plaintiffs' application was approved automatically due to the commission's failure to act on the application in a timely fashion pursuant

---

[17] The commissions's reliance on *O & G Industries, Inc.* v. *Planning & Zoning Commission*, 232 Conn. 419, 655 A.2d 1121 (1995), and *Simko* v. *Ervin*, 234 Conn. 498, 661 A.2d 1018 (1995), is misplaced. In *O & G Industries, Inc.* v. *Planning & Zoning Commission*, supra, 421–23, the plaintiff had applied to the defendant planning and zoning commission to renew its existing permit and to register its earth mining, excavation and gravel processing facility as a nonconforming use. Prior to the final public hearing on the application, the plaintiff sought a temporary injunction in the Superior Court, attempting to enjoin the commission from proceeding on its own application. Id., 424. Because the plaintiff had failed to exhaust the very administrative remedy it had initiated, this court concluded that the trial court had properly dismissed the injunction. Id., 428–29.

In *Simko* v. *Ervin*, supra, 234 Conn. 501, the plaintiffs appealed directly to the Superior Court from the zoning enforcement officer's denial of their request to issue a cease and desist order to prevent the defendant from proceeding with the construction of a two-story house. The plaintiffs had claimed that the house was in violation of one of the conditions attached to a variance that had been granted to the defendant by the Fairfield zoning board of appeals. Id., 500–501. In *Simko*, General Statutes § 8-6 (a) (1) provided for an appeal from the decision of the zoning enforcement officer to the zoning board of appeals. Id., 501. Therefore, because the plaintiffs had not appealed to the zoning board of appeals before bringing their action in the trial court, we concluded that the plaintiffs had failed to exhaust their administrative remedies. Id.

Conversely, in the present case, the plaintiffs pursued their applications before the commission to completion and were not required, under the Greenwich charter, to appeal to the representative town meeting before bringing their action in Superior Court.

to § 100 (a) of the Greenwich charter. We affirm the trial court's determination, but for different reasons from those given by the trial court.

In order to put this claim into context, it first is necessary to review the timing of the application process involved in this action. On February 5, 1998, the plaintiffs filed their first application with the commission, requesting, in part, municipal improvement approval. The next regularly scheduled meeting of the commission subsequent to the filing of the application occurred on February 24, 1998. Thereafter, on May 22, 1998, the commission published a notice in a local newspaper stating that by resolution adopted May 12, 1998, the commission postponed a decision on the plaintiffs' municipal improvement proposal "until a final report is received from the [inland wetlands and watercourses agency] . . . ." The commission received the final report from the inland wetlands and watercourses agency on June 26, 1998. Finally, on June 30, 1998, the commission voted to reject both applications submitted by the plaintiffs, including the municipal improvement portion of those applications.

Section 100 (a) of the Greenwich charter provides that the failure of the commission to act upon a municipal improvement application "within ninety (90) days after such *submission* shall be deemed to constitute an approval thereof." (Emphasis added.) It further provides that the commission "may, by resolution adopted *prior to the termination of the ninety (90) day period* and for sufficient reasons to be stated in the resolution, defer *approval* for any length of time reasonably necessary." (Emphasis added.) See footnote 8 of this opinion. It is undisputed that the commission did not defer action prior to the termination of the ninety day period. As noted previously, the plaintiffs filed their municipal improvement application on February 5, 1998. The ninety day period in which the commission had either

to act upon the application or to defer its approval expired on May 6, 1998. Therefore, the commission's May 12, 1998 resolution to postpone its decision on the plaintiffs' proposal came too late because the proposal had been approved automatically by the commission's failure to act by the May 6 deadline.

In an attempt to avoid that result, the commission appears to claim that, because the term "submission" is not defined under the Greenwich charter, we should apply the definition provided under General Statutes § 8-26d,[18] to § 100 (a) of the Greenwich charter. In so

---

[18] General Statutes § 8-24, which requires approval from the commission for municipal improvement projects, provides: "Municipal improvements. No municipal agency or legislative body shall (1) locate, accept, abandon, widen, narrow or extend any street, bridge, parkway or other public way, (2) locate, relocate, substantially improve, acquire land for, abandon, sell or lease any airport, park, playground, school or other municipally owned property or public building, (3) locate or extend any public housing, development, redevelopment or urban renewal project, or (4) locate or extend public utilities and terminals for water, sewerage, light, power, transit and other purposes, until the proposal to take such action has been referred to the commission for a report. Notwithstanding the provisions of this section, a municipality may take final action approving an appropriation for any proposal prior to the approval of the proposal by the commission pursuant to this section. The failure of the commission to report within thirty-five days after the date of official submission of the proposal to it for a report shall be taken as approval of the proposal. In the case of the disapproval of the proposal by the commission the reasons therefor shall be recorded and transmitted to the legislative body of the municipality. A proposal disapproved by the commission shall be adopted by the municipality or, in the case of disapproval of a proposal by the commission subsequent to final action by a municipality approving an appropriation for the proposal and the method of financing of such appropriation, such final action shall be effective, only after the subsequent approval of the proposal by (A) a two-thirds vote of the town council where one exists, or a majority vote of those present and voting in an annual or special town meeting, or (B) a two-thirds vote of the representative town meeting or city council or the warden and burgesses, as the case may be. The provisions of this section shall not apply to maintenance or repair of existing property, public ways or buildings."

General Statutes § 8-26d provides: "Hearings and decisions. Time limits. Day of receipt. (a) In all matters wherein a formal application, request or appeal is submitted to a planning commission under this chapter and a hearing is held on such application, request or appeal, such hearing shall

doing, it contends that "submission" refers not to the date that the application was filed, but, rather, to the date of the next regularly scheduled commission meeting.[19] Accordingly, the commission maintains that it had

commence within sixty-five days after receipt of such application, request or appeal and shall be completed within thirty-five days after such hearing commences. All decisions on such matters shall be rendered within sixty-five days after completion of such hearing. The applicant may consent to one or more extensions of any period specified in this subsection, provided the total extension of any such period shall not be for longer than the original period as specified in this subsection, or may withdraw such application, request or appeal.

"(b) A decision on an application for subdivision approval, on which no hearing is held, shall be rendered within sixty-five days after receipt of such application. The applicant may consent to one or more extensions of such period, provided the total period of any such extension or extensions shall not exceed sixty-five days.

"(c) For purposes of subsection (a) or (b) of this section, the receipt of an application, request or appeal shall be the day of the next regularly scheduled meeting of such commission or board, immediately following the day of submission to such board or commission or its agent of such application, request or appeal or thirty-five days after such submission, whichever is sooner. If the commission or board does not maintain an office with regular office hours, the office of the clerk of the municipality shall act as the agent of such commission or board for the receipt of any application, request or appeal.

"(d) Notwithstanding the provisions of this section, if an application involves an activity regulated pursuant to sections 22a-36 to 22a-45, inclusive, and the time for a decision by a planning commission established pursuant to this section would elapse prior to the thirty-fifth day after a decision by the inland wetlands, the time period for a decision shall be extended to thirty-five days after the decision of such agency. The provisions of this subsection shall not be construed to apply to any extension consented to by an applicant."

Subsection (a) of this statute was amended by Public Acts 1999, No. 99-21, § 2, which changed the time limit for completing a hearing from thirty to thirty-five days after the start of the hearing. The amendment occurred after the commencement of this action and has no effect on this case. For purposes of clarity, however, references herein are to the current revision of the statute.

[19] The trial court analyzed the running of the ninety day period from both the date that the application was filed—February 5, 1998—and the date of the first regularly scheduled meeting following the filing of the application—February 24, 1998. With regard to both dates, the trial court concluded that because the commission had not complied with § 100 of the town charter,

deferred approval of the municipal improvement application before expiration of the ninety day period prescribed under § 100 (a) of the Greenwich charter.[20] Specifically, it argues that ninety days from February

it automatically had approved the municipal improvement portion of the plaintiffs' application.

In applying the February 5 date as the date of submission, the trial court properly concluded that the commission had failed to act on the application within the ninety days prescribed under the Greenwich charter, as that time period expired on May 6, 1998. When analyzing the timeliness of the commission's actions from the date of the first regularly scheduled meeting, however, the trial court improperly determined that, even though the commission's May 12 decision to defer the applications had fallen within the ninety day period, because the commission ultimately had rejected the plaintiffs' applications, their May 12, 1998 deferral was invalid under the Greenwich charter. Specifically, the trial court reasoned that § 100 (a) of the Greenwich charter gave the commission the power only to defer *approval* of the applications and, therefore, that because the commission ultimately voted to *reject* the plaintiffs' application on June 30, 1998, their prior deferment was defective.

The trial court's interpretation of the Greenwich charter renders any determination by the commission to defer a decision on a municipal application meaningless, as any deferment is predetermined to be a rejection of the application. Indeed, under the trial court's reasoning, the commission *could not* reject the plaintiffs' municipal improvement applications because it had previously voted to defer its final decision thereon. Any ultimate approval of the applications would have been inconsequential because, following the trial court's logic, the applications had been approved automatically when the commission chose to postpone its decision. Such a construction is not a rational reading of the charter provision.

Finally, the trial court also determined improperly that, even if the commission had the power to defer a final rejection on the municipal improvement applications, it had failed to act within the time period required by § 100 (a) of the Greenwich charter. Specifically, the trial court concluded that because the commission had determined to postpone a decision on the plaintiffs' municipal improvement proposal *until* receipt of a final report from the inland wetlands and watercourses agency, it was required to act *immediately* upon receiving the report. Because the commission did not render its decision until four days *after* obtaining the report, the trial court concluded that its decision was untimely. We conclude that such a reading of the commission's deferral resolution was improper because, had this deferral been timely, the commission would have been entitled to a reasonable period of time to read and evaluate the agency's report.

[20] More specifically, the commission claims that ninety days from February 24, 1998, the date of the first regularly scheduled meeting, was May 25, 1998.

24, 1998 was May 25, 1998. Because the commission had resolved, on May 12, 1998, to postpone a decision on the plaintiffs' application until receipt of a final report from the inland wetlands and watercourses agency, the commission contends that it had complied with § 100 (a) of the town charter. We are not persuaded.

The commission claims that the plaintiffs' municipal improvement applications in this action were submitted under §§ 99 and 100 of the Greenwich charter. Thus, § 8-26d, by its own terms, is inapplicable. In its analysis of this issue, the commission applies the ninety day time period for action or deferral on the municipal improvement application allowed under the charter, not the thirty-five day time period permitted under § 8-26d.[21] The commission, however, wants both to take advantage of the ninety day deadline permitted under the charter, while also applying what it believes is a favorable definition of "submission" under § 8-26d. We conclude, however, that § 8-26d does not help its cause.

The legislature's use of the word "submission" in § 8-26d shows that the date of submission could not possibly be the same date as that for the next regularly scheduled meeting. Specifically, the statutory language provides that "the receipt of an application . . . shall be the day of the next regularly scheduled meeting of such commission or board, immediately following the day of submission to such board or commission or its

Because the commission had resolved, on May 12, 1998, to postpone a decision on the plaintiffs' proposal until receipt of a final report from the inland wetlands and watercourses agency, the commission contends that it had complied with § 100 (a) of the town charter.

[21] Under General Statutes §§ 8-24 and 8-26d, the commission has only thirty-five days from the date of submission in which it must act on a municipal improvement application, clearly much less time than that which is permitted under § 100 of the Greenwich charter. See footnote 18 of this opinion. Accordingly, under § 8-26d, the commission's May 12, 1998 resolution to postpone its decision on the plaintiffs' application was untimely.

agent of such application . . . or thirty-five days after such submission, whichever is sooner. . . ." General Statutes § 8-26d (c). As the plaintiffs correctly note, the statute "creates two alternative 'trigger' dates for the commencement of the applicable time period: (a) the date of the next regularly scheduled meeting of the commission immediately *following the day of 'submission' of the application* or (b) thirty-five days after such 'submission,' whichever is sooner." (Emphasis added.) The use of the term submission in each alternative shows that the date of submission is not the same date as that of the next regularly scheduled meeting. The only applicable date in this action, prior to the date of the regularly scheduled meeting, was the date that the application was filed, February 5, 1998. Therefore, even under § 8-26d, the date of submission is the date that the application was filed. Accordingly, we conclude that § 8-26d is of no help to the commission. Thus, we reiterate that, because the commission had failed to act on the plaintiffs' municipal improvement application within the ninety day period prescribed under § 100 (a) of the Greenwich charter, the application was approved automatically by operation of law.

IV

We next consider whether P.A. 00-206, § 1 (g), as it amended § 8-30g (c), applies retroactively. That determination controls our analysis of the remaining issues in this appeal. In order to address this issue, we must put § 8-30g in its historical context.

In 1987, the legislature established the blue ribbon commission on housing (blue ribbon commission). Public Acts 1987, No. 87-550, § 4 (a). The original affordable housing statute, as enacted by No. 89-311 of the 1989 Public Acts (P.A. 89-311) and codified as § 8-30g (c), was based largely on the report of the blue ribbon commission. That commission had concluded that

affordable housing applications routinely were being denied at the local level for insignificant reasons and that these denials were being upheld on appeal by courts applying the traditional standard of review in zoning appeals, namely, requiring that the *appealing aggrieved party* "marshal the evidence in the record, and . . . establish that the decision was *not* reasonably supported by the record." (Emphasis in original.) *Christian Activities Council, Congregational* v. *Town Council*, 249 Conn. 566, 576, 735 A.2d 231 (1999) (*Christian Activities Council*). In its report, the blue ribbon commission stated that "[m]any times the local commissions' decisions elevate vaguely-stated and relatively unimportant concerns over the important need to build affordable housing." Blue Ribbon Commission on Housing, Report and Recommendations to the Governor and General Assembly (February 1, 1989) p. A-7. To remedy this, the blue ribbon commission recommended a new review procedure in which "the reasons given by a commission or agency for its adverse decision will have to be persuasively supported in the record to support the reasons it gives for its decisions. Because of the importance of developing affordable housing, the normally applicable presumption of regularity that applies to municipal enactments would not apply in Affordable Housing Appeals." Id., p. A-9. Thus, a fundamental purpose of the affordable housing statute was to eliminate this deference to commission judgments. To accomplish the goals of the blue ribbon commission, P.A. 89-311, § 1, required local commissions to satisfy the four-pronged test set forth in what then was codified as § 8-30g (c), effective in 1990. See footnote 3 of this opinion.

In 1999, this court decided *Christian Activities Council*, supra, 249 Conn. 579, an appeal under § 8-30g (b) from a zoning commission's denial of an affordable housing land use application. In that case, we addressed the scope of our review under § 8-30g (c) (1). Id., 578.

Specifically, we were presented with the claim that, "although § 8-30g (c) (1) (A) requires only that the [commission] prove that its decision and the reasons for it be supported by 'sufficient evidence in the record,' the [commission] has a higher burden under § 8-30g (c) (1) (B) and (C)." Id.; see footnote 3 of this opinion. We disagreed, and concluded that the commission's burden under § 8-30g (c) (1) (B) and (C), as well as subparagraph (D), was "the same as that under subparagraph (A), namely, to establish that its decision and the reasons cited in support of that decision [were] supported by sufficient evidence in the record."[22] Id., 579. We stated further that the trial court's task in determining whether the commission had satisfied its burden under subparagraphs (B), (C) and (D) of § 8-30g (c) (1) was "not to weigh the [record] evidence itself." Id., 589. Rather, it was to apply the "sufficient evidence in the record" test of subparagraph (A), namely, to review the evidence and determine whether, based upon that evidence, there was *sufficient evidence* for the *commission* reasonably to have concluded that: (1) the decision was necessary to protect substantial public interests in health, safety, or other matters; (2) the public interests that the commission sought to protect clearly outweighed the need for affordable housing; and (3) such public interests could not be protected by reasonable changes to the affordable housing development. Id., 589–90. In reaching this conclusion, we reasoned that "[e]ach of the four subparagraphs . . . inextricably [was] linked textually with the others," and that "[t]he legislature undoubtedly contemplated that, in the typical case, subparagraph (A) would provide

---

[22] Essentially, we concluded that "[t]he commission's only burden was to show that the record before the [commission] support[ed] the decision reached . . . and that the commission did not act arbitrarily . . . illegally . . . or in abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Christian Activities Council,* supra, 249 Conn. 585.

the scope of review for subparagraphs (B), (C) and (D)." Id., 590–91.

## A

In the present action, in determining whether the commission had satisfied its burden under subparagraphs (B), (C) and (D), of § 8-30g (c) (1), the trial court followed our analysis in *Christian Activities Council*, and reviewed the commission's reasons for denying the plaintiffs' applications under the "sufficient evidence in the record" test of subparagraph (A).[23] Subsequent to our decision in *Christian Activities Council*, and during the pendency of the present appeal, however, the legislature enacted P.A. 00-206, § 1 (g), effective October 1, 2000, amending § 8-30g (c).[24] See footnote 14 of this opinion. That act, with the deleted portions of the former codification of the statute indicated in brackets, provides in relevant part that "[u]pon an appeal taken under subsection [(b)] *(f)* of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that [(1) (A)] the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. [; (B)] *The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1) (A) the decision is necessary to protect substantial public interests in*

---

[23] Specifically, with respect to each reason provided by the commission for denying the plaintiffs' applications, the trial court applied the "sufficient evidence in the record" test of § 8-30g (c) (1) (A) to determine whether: (1) the reason was necessary to protect a substantial public interest in health, safety or other matters which the commission may legally consider; (2) such public interest clearly outweighed the need for affordable housing; and (3) such public interest could not be protected by reasonable changes to the affordable housing development.

[24] This amendment was the result of the findings of a second blue ribbon commission to study affordable housing, created by Special Acts 1999, No. 99-16.

health, safety, or other matters which the commission may legally consider; [(C)] *(B)* such public interests clearly outweigh the need for affordable housing; and [(D)] *(C)* such public interests cannot be protected by reasonable changes to the affordable housing development . . . ." (Emphasis in original.) P.A. 00-206, § 1 (g). Specifically, the legislature, in P.A. 00-206, § 1 (g), inserted a period after what had been subparagraph (A) of § 8-30g (c) (1), essentially severing the connection between the words "sufficient evidence" and what had been subparagraphs (B), (C) and (D) of that subsection.[25] The issue we are faced with, therefore, is whether this textual change to the statute affects our scope of review in determining whether the commission has met its burden under § 8-30g (c) (1) (B), (C) and (D), and whether the amendment to § 8-30g (c) has retroactive application.

Both parties rely on the 2000 amendment to § 8-30g (c) to support their respective positions. Greyrock claims that P.A. 00-206, § 1 (g), has retroactive applicability because it was passed in direct response to this court's decision in *Christian Activities Council*, supra, 249 Conn. 566. In contrast, the commission and the individual defendants contend that the legislature did not intend retroactive application of the amendment. Specifically, they maintain that, because P.A. 00-206, in its entirety, provides for comprehensive and sweeping substantive changes in the affordable housing appeals procedure, the amendment does far more than clarify or amend § 8-30g and, therefore, should be applied only prospectively.[26] Additionally, the defendants maintain that even if this court concludes that P.A. 00-206, § 1

___

[25] For purposes of clarity, we will continue to refer herein to the specific subparagraphs of § 8-30g (c) (1) as they were labeled prior to the amendment.

[26] Public Act 00-206, in its entirety, significantly and substantively amends various provisions of § 8-30g. In the present action, however, we are concerned only with the amendment with regard to its affect on subsection (c) of § 8-30g.

(g), warrants retroactive application, it does not alter the commission's burden of proof under § 8-30g (c) (1) and, therefore, should not affect the result in this case.

Before addressing the retroactive application of P.A. 00-206, § 1 (g), we must "begin this analysis by differentiating between two different, but related concepts [that are commonly misconstrued]: (1) a burden of persuasion; and (2) the scope of judicial review of an administrative decision, including a zoning decision. The concept of a burden of persuasion ordinarily applies to questions of fact, and ordinarily is expressed in one of three ways: (1) a preponderance of the evidence; (2) clear and convincing evidence; or (3) proof beyond a reasonable doubt. . . . The function of the burden of persuasion is to allocate the risk of error on certain factual determinations, and to indicate the relative social importance of the factual determination at issue. . . . In a zoning case, the fact finder ordinarily is the zoning agency, not the court.

"The concept of the scope of judicial review of an administrative decision, by contrast, applies to both the factual and legal decisions made by the administrative agency in question, including a zoning agency, and ordinarily differs depending on whether the court is reviewing a factual or legal determination by the agency. See, e.g., *Connecticut Resources Recovery Authority* v. *Zoning Board of Appeals*, 225 Conn. 731, 744, 626 A.2d 705 (1993) ('trial court must uphold the board's decision [regarding factual determinations] if it is reasonably supported by the record'); *North Haven* v. *Planning & Zoning Commission*, 220 Conn. 556, 561, 600 A.2d 1004 (1991) (applying plenary review to question of law). The function of the scope of judicial review is to express the policy choice, ordinarily drawn from the governing statutes, regarding the allocation of decision-making authority as between the administrative agency and the reviewing courts, and, more specifi-

cally, to articulate the degree of constraint that the statutes place upon the courts in reviewing the administrative decision in question. Where the administrative agency has made a factual determination, the scope of review *ordinarily* is expressed in such terms as substantial evidence or sufficient evidence. . . . Where, however, the administrative agency has made a legal determination, the scope of review ordinarily is plenary." (Citations omitted; emphasis added.) *Christian Activities Council*, supra, 249 Conn. 580–81.

In the present case, the amendment addresses the *scope of review*, not the burden of persuasion.[27] "The court's function in an appeal under § 8-30g (c) (1) is to apply the scope of judicial review, as expressed in subparagraphs (A), (B), (C) and (D), to the pertinent determinations made by the zoning commission. Put another way, the statute contemplates that the zoning commission will have made certain factual determinations in the zoning proceedings, and the court is obligated to review those factual determinations pursuant to the scope of review stated in the statute." Id., 581–82. The issue we are presented with in this appeal is whether, pursuant to P.A. 00-206, § 1 (g), the scope of our review under subparagraphs (B), (C) and (D) of § 8-30g (c) (1) is different from our scope of review under subparagraph (A) of that statute, and if so,

[27] In its brief, Greyrock, blurred the distinction between the scope of judicial review and the burden of persuasion. Specifically, Greyrock contended that in enacting P.A. 00-206, § 1 (g), the legislature merely restored the commission's *burden of proof* that it originally had to meet in affordable housing appeals before this court improperly changed that burden in *Christian Activities Council.* Greyrock additionally maintained that P.A. 00-206, § 1 (g), clarified *two standards of judicial review* under § 8-30 (c) (1) (A), (B), (C) and (D). Under subparagraph (A), Greyrock claimed that sufficient evidence in the record was all that was required to sustain the commission's decision. Under subparagraphs (B), (C) and (D), however, Greyrock claimed that the commission was required to sustain its *burden of proving the correctness of its decision, not just the existence of sufficient evidence to support it.*

whether the amendment should be applied retroactively. We conclude that P.A. 00-206, § 1 (g), was enacted to *clarify* that we do indeed have a different scope of review under subparagraphs (B), (C) and (D) than under subparagraph (A) of the statute. Accordingly, we conclude that P.A. 00-206, § 1 (g), has retroactive application.

"We have recognized a presumption that, in enacting a statute, the legislature intended to effect a change in existing law. . . . Moreover, it should not be presumed that the legislature has enacted futile or meaningless legislation or that a change in a law was made without a reason. . . . The presumption that the enactment of a statute demonstrates a legislative intent to change existing law, however, may be rebutted by contrary evidence of the legislative intent in the particular case. . . . The present discussion involves an amendment, rather than the enactment, of a statute. Although we have stated that subsequent amendments are *generally* irrelevant when determining legislative intent at the time of the enactment of the underlying bill . . . we have noted that an [a]mendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act. . . . Therefore, whether the legislature intended to change or merely clarify existing law is critical to our decision on this issue." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Dept. of Social Services* v. *Saunders*, 247 Conn. 686, 701–702, 724 A.2d 1093 (1999).

"In order to determine whether an act should be characterized as clarifying legislation [with attendant retroactive effect]," we look to the statutory language and the pertinent legislative history to determine the legislative intent. (Internal quotation marks omitted.) Id., 702; see also *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 691–92, 755

A.2d 850 (2000). The language of P.A. 00-206, § 1 (g), provides no indication of whether the legislature intended that it be applied prospectively only or retrospectively as well. The pertinent legislative history, however, contains compelling evidence that the amendment was intended to clarify, rather than to change, the original meaning of § 8-30g (c). In particular, on the floor of the Senate, Senator Eric D. Coleman, in explaining the purpose of the amendment stated: "[T]he bill seeks . . . to *make clear* that in the situation of the denial of an affordable housing application, that in the review of that application, there is a two step review process. The first step that is made by the court would be to determine whether or not there is simply sufficient evidence to uphold the decision of a land use authority and that would be a threshold determination. If the court determined that there was not sufficient evidence, then the appeal which would probably be brought by the developer would be upheld . . . . Then the court would move to the second step and that step would be to determine whether or not the decision of the [c]ommission is based upon the protection of some substantial public interest, whether or not that public interest clearly outweighs the need for affordable housing, and finally, whether or not [there are] any modifications that can reasonably be made to the application which would permit the application to be granted." (Emphasis added.) 43 S. Proc., Pt. 8, 2000 Sess., pp. 2602–2603.

In addition, during debate in the House of Representatives, Representative Patrick J. Flaherty, cochair of the blue ribbon commission, explained the purpose and effect of the amendment, stating: "[I]n an affordable housing application the court first determines whether the [c]ommission has met its burden of proof that the decision is supported by sufficient evidence in the record. Having done this, the court not the [c]ommis-

sion, then weighs whether the [c]ommission has met its burden of proof, that the decision is necessary to protect substantial public interests which clearly outweigh the need for affordable housing and which cannot be protected by reasonable changes to the affordable housing development." (Emphasis added.) 43 H.R. Proc., Pt. 14, 2000 Sess., p. 4644.

"Under the affordable housing appeals procedure, and it's in the statute, a town has the burden to prove that the public purpose for which the application was rejected outweighs the need for affordable housing and that's a fairly straightforward thing to say. And then the question becomes, who decides whether or not the town or the [c]ommission has met its burden of proof. And what needed to be *clarified* was that the court does need to make a decision as to whether or not the town has met its burden. The proposed amendment *clarifies* that without adding an additional burden on the town. . . .[28] [T]he court needs to examine the record and the court determines whether or not the town has met its burden of proof. . . . [W]e are not going to require the courts to hear witnesses or in effect, conduct a new trial . . . they can rely entirely upon the record that has been made by the [c]ommission." (Emphasis added.) Id., pp. 4657–58.

Finally, in response to a question from Representative Robert M. Ward as to why the term "matter of law" was stricken from the amendment, Representative Flaherty

[28] The commission claimed in its brief that Representative Flaherty's comment that the amendment placed no "additional burden on the town" supported its claim that the amendment did not change its burden of proof under subparagraphs (B), (C) and (D) of § 8-30g (c) (1), and, therefore, would not affect the result in this case. Although we agree that the legislative intent of P.A. 00-206, § 1 (g), was not to place an additional burden on the commission, that is not the issue the legislature intended to redress in enacting this amendment. As discussed previously in this part of the opinion, the amendment addresses the scope of our review in an affordable housing appeal, not the commission's burden of proof.

explained: "After some reflection, myself and others who were involved in the crafting of the legislation felt that the term matter of law perhaps actually advanced the issue in a way that was beyond clarifying but actually was a substantive change in the status of a court review of zoning, rejection of affordable housing applications. So those words were removed to try *to prevent an actual substantive change to what had been the previous understanding of the law.*" (Emphasis added.) Id., pp. 4656–57. In the absence of anything in the legislative history of P.A. 00-206, § 1 (g), to contradict the direct and unequivocal statements made by Senator Coleman, Representative Flaherty and Representative Ward regarding the amendment's clarifying purposes, "we afford substantial weight to [their] characterization of its objective and effect. See, e.g., *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 40–41, 699 A.2d 101 (1997) (statements by legislators that amendment clarifies existing law signify legislative intent regarding retroactivity of amendment); *Edelstein* v. *Dept. of Public Health & Addiction Services*, 240 Conn. 658, 668, 692 A.2d 803 (1997) (same); *State* v. *Magnano*, 204 Conn. 259, 281–82, 528 A.2d 760 (1987) (same)." *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, supra, 253 Conn. 692–93.

Another "factor [that] we have deemed to be significant in determining the clarifying character of legislation is that the legislation was enacted in direct response to a judicial decision that the legislature deemed incorrect." *Dept. of Social Services* v. *Saunders*, supra, 247 Conn. 702; see also *Toise* v. *Rowe*, 243 Conn. 623, 628–29, 707 A.2d 25 (1998) (reasonable to conclude that legislature's prompt and unambiguous response to controversy regarding interpretation of original act evidences legislative intent to clarify meaning of that act); *Edelstein* v. *Dept. of Public Health & Addiction Services*, supra, 240 Conn. 669 (same); *State*

v. *State Employees' Review Board*, 239 Conn. 638, 651, 687 A.2d 134 (1997) (same). On the floor of the House of Representatives, Representative Flaherty stated that the purpose of the amendment "was to bring some clarity to the confusion that has arisen due to a recent Supreme Court decision," that is, *Christian Activities Council*, supra, 249 Conn. 566. 43 H.R. Proc., supra, p. 4656. In commenting on the effect of the amendment, Representative Flaherty explained: "The amendment simply breaks the review standards of the act into two separate sentences. The purpose is to clarify the difference between the sufficiency of the evidence standard in the first sentence and the weighing test in the second sentence, *a matter which seems to have caused some concern as the result of a recent Supreme Court decision.*" (Emphasis added.) Id., pp. 4643–44. The legislature's prompt and unambiguous response to this court's decision in *Christian Activities Council* provides persuasive support for Greyrock's contention that the legislature intended to clarify, rather than to change, the scope of our judicial review of a commission's decision to deny an affordable housing land use application. Indeed, the foregoing analysis demonstrates clearly that the proponents of this amendment believed that, prior to our decision in *Christian Activities Council*, our scope of review had involved a two step process. Once those steps were blurred in *Christian Activities Council*, however, the legislature sought to restore the process.

In summary, we conclude, on the basis of our review of the legislative history, that P.A. 00-206, § 1 (g), was intended to clarify the original intent of § 8-30g (c), namely, that there are two standards of judicial review under § 8-30g (c) (1) (A) through (D).[29] We begin by

___

[29] "Because the plaintiff[s'] appeal to the trial court is based solely on the record, the scope of the trial court's review of the [commission's] decision and the scope of our review of that decision are the same." *Christian Activities Council*, supra, 249 Conn. 578 n.12.

noting the established rule that "as in a typical zoning appeal, the court's function [in an appeal under § 8-30g (c)] is to review the record made in the zoning proceeding." *Christian Activities Council*, supra, 249 Conn. 582. Under § 8-30g (c) (1) (A), the court must determine, as we had prior to the enactment of P.A. 00-206, § 1 (g), whether the commission has shown that its decision is supported by "sufficient evidence" in the record. Under subparagraphs (B), (C) and (D) of the statute, however, the court must review the commission's decision independently, based upon its own scrupulous examination of the record. Therefore, the proper scope of review regarding whether the commission has sustained its burden of proof, namely that: its decision is based upon the protection of some substantial public interest; the public interest clearly outweighs the need for affordable housing; and there are no modifications that reasonably can be made to the application that would permit the application to be granted—requires the court, not to ascertain whether the commission's decision is supported by sufficient evidence, but to conduct a plenary review of the record in order to make an independent determination on this issue. Cf. *State v. Pinder*, 250 Conn. 385, 409–12, 736 A.2d 857 (1999) ("As to the scope of our review of the trial court's findings concerning custodial interrogation . . . [w]e first examine the trial court's conclusion regarding the historical facts in order to determine whether it is clearly erroneous. We next conduct an *independent review* . . . by scrupulously examining the record to determine if an application of the law to the facts leads us to conclude that the defendant was in custody. . . . [O]ur approach [essentially is] to conduct a plenary review of the record in order to make an independent determination of custody." [Citations omitted; emphasis added; internal quotation marks omitted.]).

Public Act 00-206 appears to be a "classic reaction to a judicial interpretation that was deemed inappropri-

ate." *State* v. *Magnano*, supra, 204 Conn. 283. As this court stated in *Magnano*: "[O]nce litigation brought that ambiguity to light, the legislature acted to remove any doubt about its earlier intentions. Its action in [passing the amendment] therefore invokes the principle of statutory construction that [i]f the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act. . . . Even though the legislative clarification was prompted by a judicial decision that the legislature deemed mistaken, such a clarification does not constitute an invasion of judicial authority. Like legislatures, judges are fallible." (Citation omitted; internal quotation marks omitted.) Id., 283–84. The legislature has the power to make evident to us that it had always intended a more stringent scope of review in an affordable housing land use appeal. Therefore, we conclude that the legislature intended P.A. 00-206, § 1 (g), to be retroactive. Accordingly, the trial court's application of the "sufficient evidence in the record" test of § 8-30g (c) (1) (A) to subparagraphs (B), (C) and (D) of that statute, although reasonably based upon our decision in *Christian Activities Council*, was nevertheless, improper. Accordingly, a new trial is required.

B

We next consider the argument submitted by both the commission and the individual defendants that the trial court improperly concluded that the commission's written decision, denying the plaintiffs' applications, was defective to the extent that the commission had not stated expressly, pursuant to § 8-30g (c) (1) (C), that the reasons for its decision clearly outweighed the need for affordable housing. Specifically, the defendants contend that, although § 8-30g (c) (1) (C) provides that the burden is on the commission to prove that "such public interests clearly outweigh the need for

affordable housing," that statute does not require that the commission make an affirmative statement in its decision to that regard. We agree.

In *Christian Activities Council,* supra, 249 Conn. 577, we recognized the duty of a zoning commission deciding an affordable housing application to comply with § 8-30g (c) (1) (A), (B), (C) and (D), stating that "[t]hese requirements strongly *suggest* that the town be obligated, when it renders its decision, to identify those specific public interests that it seeks to protect by that decision, so that the court in reviewing the decision will have a clear basis on which to do so." (Emphasis added.) We further acknowledged that "[r]equiring the town to state its reasons on the record when it denies an affordable housing land use application . . . will help guard against possibly pretextual denials of such applications." Id. In that case, however, we concluded that the commission, in denying the plaintiff's application for a zone change, had satisfied the requirements of § 8-30g (c) (1) (A) through (D), reasoning that the commission had "explicitly cited the public interests in traffic safety, water supply preservation and open space . . . explicitly concluded that these interests outweighed the need for public housing . . . and . . . *implicitly* concluded that no reasonable changes to the proposed development could protect those interests." (Emphasis added.) Id., 590–91. This portion of our decision was not affected by P.A. 00-206, § 1 (g). Our analysis demonstrates that in *Christian Activities Council,* the commission was not required to make an *affirmative statement* in its decision *explicitly declaring* that no reasonable changes to the proposed development could protect the public interests in traffic safety, water supply preservation and open space in order to satisfy subparagraph (D) of § 8-30g (c) (1).

Similarly, in the present action, the commission was not required to *state expressly* in its decision that its

reasons for rejecting the applications clearly outweighed the need for affordable housing in order to satisfy subparagraph (C) of § 8-30g (c) (1). As the defendants properly note, such a requirement would exalt form over substance and result in an "unwarranted disregard" of any legitimate reasons that the commission may have had for denying the application, simply because it failed to recite the exact language of subparagraph (C).

This conclusion, in fact, is more apparent in light of P.A. 00-206, § 1 (g), as it amends § 8-30g (c) (1) (A) through (D). See footnote 14 of this opinion. As Representative Flaherty stated during debate on the amendment in the House of Representatives, "the *court not the [c]ommission . . . weighs* whether the [c]ommission has met its burden of proof . . . *that the decision is necessary to protect substantial public interests which clearly outweigh the need for affordable housing* and which cannot be protected by reasonable changes to the affordable housing development." (Emphasis added.) 43 H.R. Proc., supra, p. 4644. Therefore, because it is the court's duty to examine the record scrupulously to determine whether the commission's reasons for denying the application "clearly outweigh the need for affordable housing"; id., remarks of Representative Flaherty; certainly then, there is no need for the commission to recite the precise words of § 8-30g (c) (1) (C) in order to satisfy its burden under the statute. In reviewing the actions of a land use commission, we must recognize that the commission "is composed of laymen whose procedural expertise may not always comply with the multitudinous statutory mandates under which they operate." *Gagnon* v. *Inland Wetlands & Watercourses Commission,* 213 Conn. 604, 611, 569 A.2d 1094 (1990). We "must be scrupulous not to hamper the legitimate activities of civic administrative boards by indulging in a microscopic search for *techni-*

*cal infirmities* in their actions," such as the one claimed in the present action. (Emphasis added.) *Couch* v. *Zoning Commission*, 141 Conn. 349, 358, 106 A.2d 173 (1954). Therefore, because the commission was not required to state explicitly in its decision that its reasons for denying the plaintiff's application clearly outweighed the need for affordable housing, we conclude that the trial court's decision to the contrary was improper.

C

Finally, we address the interrelationship of §§ 22a-19 (b) and 8-30g (c) (1) (D), specifically, whether the plaintiffs in this action, as applicants, had the burden to show that there were no other "feasible and prudent alternative[s]" to the proposed development that were "consistent with the reasonable requirements of the public health, safety and welfare"; General Statutes § 22a-19 (b); see footnote 2 of this opinion; or whether the commission had the burden of proving that the public interest "[could not] be protected by reasonable changes to the affordable housing development . . . ." General Statutes (Rev. to 1997) § 8-30g (c) (1) (D); see footnote 3 of this opinion. As discussed previously in this opinion, the trial court concluded that, in an appeal from the denial of an affordable housing application, the commission, not the applicants, had the burden of proving subparagraph (D) of § 8-30g (c) (1), namely, that the public interest could not be protected by reasonable changes to the affordable housing development. The trial court also determined that, to the extent that the two statutes conflicted concerning which party bore the burden of proof, § 8-30g controlled because it was enacted after § 22a-19.

Both the commission and the individual defendants claim that the trial court's conclusion was improper, contending that its interpretation of the interrelation-

ship between § 8-30g and § 22a-19 would result in an erroneous implied repeal of § 22a-19. They maintain that, once the individual defendants had intervened in the proceedings before the commission under § 22a-19 (a), the burden shifted to the plaintiffs under § 22a-19 (b), as the applicants, to show that no prudent alternative to their plan existed. The commission and the individual defendants further argue that the plain language of § 8-30g does not alter the requirement under § 22a-19 that the applicant, not the commission should bear the burden with respect to feasible and prudent alternatives.

In contrast, the plaintiffs contend that § 22a-19 does not place the burden of negating feasible and prudent alternatives on them. Rather, the plain language of § 22a-19 (b) requires that the *commission consider* feasible and prudent alternatives, which the plaintiffs argue is just another way of stating the requirement of § 8-30g (c) (1) (D), that the commission should attempt to make all reasonable changes to an application for an affordable housing development before denying it. We agree with the plaintiffs.[30]

"When interpreting a statute, we are guided by well established tenets of statutory construction. [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Furthermore, [w]e presume that laws are enacted in view of existing relevant statutes . . . and that [s]tatutes are

---

[30] We note, however, that our conclusion in this regard is limited to the context of the interrelation between §§ 22a-19 and 8-30g (c) (1) (D).

to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law." (Internal quotation marks omitted.) *Dept. of Social Services* v. *Saunders*, supra, 247 Conn. 697–98.

Applying these principles to our interpretation of §§ 8-30g (c) (1) (D) and 22a-19 (b), we conclude that the legislature intended that the commission bear the burden of proving under § 8-30g (c) (1) (D), that the public interest cannot be protected by reasonable changes to the applicants' proposed development. We further conclude that § 22a-19 (b) does not conflict with § 8-30g (c) in this regard. First, the plain and unambiguous language of § 8-30g (c) (1) (D) supports this conclusion. Indeed, subsection (c) of that statute explicitly provides that "the burden shall be on the *commission to prove,* based upon the evidence in the record compiled before such commission that (1) . . . (D) *such public interests cannot be protected by reasonable changes to the affordable housing development . . . .*" (Emphasis added.) General Statutes (Rev. to 1997) § 8-30g (c) (1) (D). Therefore, it is clear, under the plain and ordinary meaning of this statute, that the commission has the burden to prove whether reasonable changes can be made to the proposed development.

The circumstances surrounding the enactment of § 8-30g (c) and its legislative history further support our conclusion that the commission has the burden to prove that the public interest cannot be protected by reasonable changes to the proposed development. *Christian Activities Council,* supra, 249 Conn. 576 (legislative history reveals, in contrast to traditional zoning appeals, that § 8-30g [c] requires town, not applicant, to marshal evidence supporting its decision). Indeed, during the floor debate in the House of Representatives, Representative Miles S. Rapoport stated, in response to criticism concerning the statute, that "[t]he original proposal was

a much stronger proposal," noting further that "the proposal got watered down just to a body that could be appealed to and then watered down further to judicial review with a small *change* from current law that *the burden of proof for the denial of an affordable housing project rests with the town as opposed to with the people who want to build affordable housing.*" (Emphasis added.) 32 H.R. Proc., Pt. 30, 1989 Sess., pp. 10,673–74. Representative Rapoport commented additionally that such a change from existing zoning law was "a small step in putting forward that the towns have to be able to show that they have considered and rejected the need for affordable housing before they make a decision."[31] Id., p. 10,674.

In addition, as noted previously in part IV A of this opinion, during the floor debate in the House of Representatives concerning P.A. 00-206, § 1 (g), as it amended § 8-30g (c), several representatives explicitly referred to the *commission's* burden of proof in regard to reasonable changes to the affordable housing development.[32] Of special importance is Representative Flaherty's comment that "in an affordable housing

---

[31] The strong opposition from certain members of the legislature indicates that the legislature appreciated the impact of this change. Representative Ward stated: "I don't see this just as a shifting of the burden. I see it really as throwing out the basic concept of zoning altogether." 32 H.R. Proc., supra, p. 10,651. Representative Oskar G. Rogg remarked that, under traditional zoning law, "as long as you acted reasonably . . . you won because . . . the applicant had to prove that you were unreasonable . . . . [W]e are reversing this whole process." Id., pp. 10,666–67. Senator Fred H. Lovegrove commented that "[a]s I read this it seems to me that when a claim is filed against a municipality that they are considered guilty until they prove their innocence, I wondered why the bill wasn't written so that the burden of proof of abuse was on the developer instead of the town . . . ." 32 S. Proc., Pt. 12, 1989 Sess., p. 4052.

[32] Although P.A. 00-206, § 1 (g), did not concern the commission's burden of proof, it was evident from the remarks of various representatives that in an affordable housing appeal, the commission has the burden of proving that the public interest cannot be protected by reasonable changes to the proposed development.

application the court first determines *whether the [c]ommission has met its burden of proof* that the decision is supported by sufficient evidence in the record. Having done this, the court not the [c]ommission, then weighs *whether the [c]ommission has met its burden of proof, that the decision is necessary to protect substantial public interests which clearly outweigh the need for affordable housing and which cannot be protected by reasonable changes to the affordable housing development."* (Emphasis added.) 43 H.R. Proc., supra, p. 4644.

Turning to § 22a-19 (b), we conclude that that statute is not inconsistent with § 8-30g (c). Indeed, it is readily apparent that § 22a-19 (b) can be reconciled and given concurrent effect with § 8-30g (c) (1) (D). The relevant statutory language provides that "[i]n any administrative, licensing or other proceeding, *the agency shall consider* the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and *no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare."* (Emphasis added.) General Statutes § 22a-19 (b). In other words, § 22a-19 (b) explicitly provides that the *agency,* or the *commission* in this case, will consider, in the face of unreasonable pollution, *whether there is a feasible and prudent alternative.* Therefore, the contention by the commission and the individual defendants that § 22a-19 (b) clearly places the burden of negating prudent alternatives on the applicant is without merit.

The commission and the individual defendants rely on our decision in *Manchester Environmental Coalition* v. *Stockton,* 184 Conn. 51, 60, 441 A.2d 68 (1981),

in support of their claim that once there is a viable intervention under § 22a-19, the burden of proving whether there are prudent alternatives shifts to the applicant.[33]

In *Stockton*, however, the plaintiff had brought an injunction action against the defendant under a different statute, General Statutes § 22a-17 (a),[34] which *explicitly* provides that a defendant "may . . . prove, by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct . . . ." Section § 22a-19 contains no such burden shifting language. In addition, this court previously has stated that "although [§ 22a-19] mandate[s] that the *commission consider alternatives* to the applicants' proposed action, *nowhere is it mandated that the alter-*

---

[33] In *Manchester Environmental Coalition* v. *Stockton*, supra, 184 Conn. 59–60, this court concluded that, under § 22a-17, *after a prima facie case* of pollution is shown, the burden of production shifts to the defendant. In this case, the commission conceded that the individual defendants had met their prima facie case of showing, under § 22a-19 (a), that the plaintiffs' proposed affordable housing development was reasonably likely to have the effect of unreasonably impairing public trust in the air, water or natural resources of the state. Had there not been the requisite showing under § 22a-19 (a), the commission would not have had to consider whether there existed prudent alternatives under § 22a-19 (b). See *Paige* v. *Town Plan & Zoning Commission*, 235 Conn. 448, 462–63, 668 A.2d 340 (1995).

[34] General Statutes § 22a-17 provides in relevant part: "Defense. Appointment of master or referee. (a) When the plaintiff in any such action has made a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also prove, by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare. Except as to the aforesaid affirmative defense, nothing in this section shall be construed to affect the principles of burden of proof and weight of the evidence generally applicable in civil actions. . . ."

*natives emanate from the applicants.*" (Emphasis added.) *Red Hill Coalition, Inc.* v. *Conservation Commission*, 212 Conn. 710, 726, 563 A.2d 1339 (1989). "Absent such a direction by the legislature," we concluded in *Red Hill Coalition, Inc.* that we would not read such a requirement into the statutes. Id.; see also *Walsh* v. *Stonington Water Pollution Control Authority*, 250 Conn. 443, 462, 736 A.2d 811 (1999) (noting *commissioner's* determination that there were no other feasible and prudent alternatives to continued operation of sewage treatment plant).

In summary, we conclude that § 8-30g (c) and § 22a-19 (b) do not conflict. Indeed, as noted previously, the legislature is presumed to have knowledge of all existing statutes and the effect which its actions may have upon them. *Dept. of Social Services* v. *Saunders*, supra, 247 Conn. 697–98. Under § 8-30g (c) (1) (D), the commission has the burden of proving that the public interest cannot be protected by reasonable changes to the proposed development. The plain language of § 22a-19 (b) also requires that the *commission consider* feasible and prudent alternatives.

Our reading of the two statutes promotes the legislative policy that the affordable housing statute was designed to implement. In contrast, the defendants' proposed reading of the statutes would " 'thwart its purpose.' " *West Hartford Interfaith Coalition* v. *Town Council*, 228 Conn. 498, 511, 636 A.2d 1342 (1994). Our review of the legislative history reveals that the aim of § 8-30g is to encourage and facilitate the development of affordable housing throughout the state. Id. The defendant's proposed interpretation of the interrelationship between § 22a-19 and § 8-30g would undermine this objective. Indeed, it would render § 8-30g (c) worthless. Therefore, on the basis of the plain language of § 8-30g (c) and its legislative history, the circumstances surrounding its enactment, and the purpose for which it

was designed, we conclude that the legislature intended that the commission have the burden of proving that the public interest cannot be protected by reasonable changes to the proposed development. Section 22a-19 does not conflict with § 8-30g (c) in this regard. Accordingly, the trial court's determination on this issue was proper.

V

In summary, we conclude that the trial court properly determined that the plaintiffs were aggrieved by the decision of the commission. In addition, we conclude that Greyrock has standing to defend these appeals. We further conclude that the trial court properly determined that it had subject matter jurisdiction over the action.

Turning to the substantive arguments on appeal, we conclude that the trial court properly determined that the plaintiffs' municipal improvement proposal had been approved automatically by the commission's failure to act in a timely fashion. In addition, because we conclude that P.A. 00-206, § 1 (g), applies retroactively, the scope of judicial review we set forth in this opinion applies to the new trial we order in this action. We further conclude that the trial court improperly determined that the commission's decision was defective to the extent that it had not stated that the reasons for its decision clearly outweighed the need for affordable housing. Finally, we note that the trial court properly found that under § 8-30g (c) (1) (D), the commission, rather than the plaintiffs, had the burden of proving that no feasible and prudent alternative to the proposed development existed.

The judgment is affirmed in part and reversed in part, and the case is remanded for a new trial.

In this opinion the other justices concurred.

# APPENDIX

## ANALYSIS OF REASONS FOR DENIAL

| [Commission] Denial Reason Number | [Commission] Decision Record Page | Summary | Trial Court Decision Record Page | Prong A¹ | Prong B² | Prong C³ | Prong D⁴ |
|---|---|---|---|---|---|---|---|
| | | **Plaintiffs' Original Application** | | | | | |
| 1 | 182¶1 | size of building too large | 152 | yes | yes | no | no |
| 2 | 182¶2 | open to nonresidents | 153 | yes | no | no | no |
| 3 | 182¶3 | two applicants, one for profit | 154 | yes | no | no | yes |
| 4 | 182¶4 | site environmental difficulty failure to prove beyond reasonable doubt | 155–56 | yes | yes | no | no |
| 5 | 183¶1 | concern that groundwater may be contaminated | 156–60 | yes | yes | no | no |
| 6 | 183¶2 | soil contamination | 160 | yes | yes | no | no |
| 7 | 183¶3 | feasible & prudent alternative | 160–61 | yes | yes | no | no |
| 8 | 183¶4 | concentration of subsidized housing in one area | 161–62 | yes | no | no | yes |
| 9 | 184¶1 | height, bulk & scale of building too large | 162–63 | yes | yes | no | yes |
| 10 | 184¶2 | potential traffic increase | 163–64 | no | no | no | yes |
| 11 | 184¶3 | question of necessity for [Municipal Improvement] approval | 164 | yes | no | no | no |
| 12 | 184¶4 | unrelated zoning application by prior owner denied | 165 | yes | no | no | no |
| 13 | 184¶5 | insufficient outdoor recreational space | 165–66 | yes | yes | no | no |
| 14 | 185¶1 | intent of [commission's] 1998 plan of conservation & development | 166 | yes | yes | no | no |
| | | **Plaintiffs' Revised Application** | | | | | |
| 15 | 187¶1 | lack of second [Municipal Improvement] application | 167–68 | no | yes | no | no |
| 16 | 188¶1 | failure to request easement | 168 | no | no | no | no |
| 17 | 189¶1 | lack of proof of financially needy Greenwich residents | 169–70 | no | no | no | no |
| 18 | 189¶3 | less than 100% of units will be "affordable" | 170–71 | yes | no | no | no |
| 19 | 190¶2 | possible damage from blasting | 171 | no | no | no | no |
| 20 | 190¶3 | positive findings cannot be made under § 22a-19 | 172 | yes | no | no | no |
| 21 | 191¶1 | positive finding of complete soil remediation cannot be made | 173 | yes | yes | no | no |
| 22 | 191¶2 | positive findings cannot be made | 173–74 | yes | yes | no | no |
| 23 | 192¶1 | combination of site with another site may exceed zoning limit | 174–75 | yes | no | no | no |
| 24 | 192¶3 | safety of driveway cuts and turning radii not proven beyond reasonable doubt | 175 | yes | yes | no | no |
| 25 | 193¶2 | [State Traffic Commission] approval may be required | 175–76 | yes | yes | no | no |
| 26 | 194¶1 | inadequate outdoor recreation space | 176–77 | yes | yes | no | no |
| 27 | 194¶3 | [Site Analysis and Market Analysis] report raised issues | 177–78 | yes | yes | no | no |

¹ Did [commission] meet its burden to show sufficient evidence in record to support the reason?
² Did [commission] meet its burden to show the reason was necessary to protect a substantial public interest?
³ Did [commission] meet its burden to show the public interest in the reason clearly outweighed need for affordable housing?
⁴ Did [commission] meet its burden to show that reasonable changes to the proposal will not protect the public interest?